**In re Joseph H. MASTROMARINO, Debtor.**

**Bankruptcy No. 95–10608.**

United States Bankruptcy Court, D. Maine.

June 11, 1996.

Robert S. Lingley, Russell, Lingley & Silver, Bangor, ME, for Debtor.

Robert Checkoway, Asst. U.S. Trustee, Portland, ME, for movant.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Before me is the U.S. Trustee's § 707(b) motion seeking dismissal of Dr. Joseph Mastromarino's voluntary Chapter 7 case. For the reasons set forth below, I conclude that to provide Mastromarino the relief he seeks would be a "substantial abuse" of Chapter 7's provisions and therefore will grant the motion.[1]

### Background

Mastromarino filed his Chapter 7 petition on August 14, 1995. His schedules listed $583,900.00 in secured debt and $189,321.00 in unsecured debt. The U.S. Trustee filed a timely motion to dismiss.[2] After substantial discovery, it came before me in accordance with Fed.R.Bankr.P. 1017(d), (e) and 9014; Me.Bankr.R. 9013 and 9014, and was submitted on a stipulated record.

### Facts

When he filed bankruptcy, Mastromarino was an experienced, but unemployed, emergency room physician.[3] In the years immediately preceding his bankruptcy, working at Eastern Maine Medical Center in Bangor, Maine, his gross annual earnings approximated $250,000.00. At bankruptcy, Mastromarino disclosed that he expected to become reemployed, with anticipated earnings of $14,500.00 per month, within weeks. The prediction proved true. Since September 1995 he has worked at a Connecticut hospital where he earns $16,613.00 per month, yielding monthly income after taxes of $9,626.00.

The bankruptcy filing followed close on the heels of Mastromarino's divorce. An April 1995 settlement agreement and divorce judgment set aside substantial assets to Mastromarino's ex-wife and, among other things, requires him to pay $1,500.00 per month in alimony, to pay $2,100.00 per month in child support, to provide health insurance and to fund private school tuition for his two children.[4]

Now residing in Connecticut, Mastromarino has not remarried, but lives with his "domestic partner," a woman with four children from a previous marriage.[5] Together their monthly net income (including child support payments she receives) is $10,715.00. Mastromarino asserts, however, that after expenses he has but $66.00 available to repay his creditors.

### Discussion

#### 1. Section 707(b)

■ "Bad faith" has long been recognized as a ground upon which a consumer debtor's voluntary resort to Chapter 7 relief might be thwarted. See, e.g., Industrial Ins. Serv., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1126–27 (6th Cir.1991) (collecting § 707(a) dismissal cases based on bad faith); In re Herbst, 95 B.R. 98, 101 (W.D.Wis.1988); In re Snow, 185 B.R. 397, 400 (Bankr.D.Mass. 1995); Note, The Thickening Fog of "Sub-

---

1. This memorandum sets forth findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52 and Fed.R.Bankr.P. 7052. Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101 et seq.

2. Such motions must be filed within sixty days of the first date set for the meeting of creditors. Fed.R.Bankr.P. 1017(e).

3. Mastromarino was "fired" by E.M.M.C., given 90 days notice, in late March or early April 1995. Ex. 2; Mastromarino Answer to Interrog. No. 8.

4. The child support obligation is adjustable downward to $1,550.00 per month if Mastromarino's annual gross earnings fall below $130,-000.00. Alimony is fixed for seven years, "regardless of any change in circumstances," with only the possibility of increase in the event his ex-wife pays designated marital debts. Ex. D4–n at ¶¶ 3, 8. I express no view whether such provisions would bind the parties in state court. Cf., e.g., Me.Rev.Stat.Ann. tit. 19, § 721(5) (1964 & Supp.1995) (modification of alimony).

5. Although the U.S. Trustee's brief and the debtor's brief refer to four and three children respectively, the number is four. E.g., Ex. 2; Mastromarino Answer to Interrog. No. 17.

*stantial Abuse": Can § 707(a) Help Clear the Air?*, 2 Am.Bankr.Inst.L.Rev. 193, 198–99 (1994) [hereinafter *"Fog "*]; Note, *Section 707(b) of the Bankruptcy Code: A Roadmap with a Proposed Standard for Defining Substantial Abuse*, 19 U.Mich.J.L.Ref. 1011, 1029–35 (1986) [hereinafter *"Roadmap"*]. Section 707(b)'s 1984 enactment placed an additional restriction on consumers' access to such relief. *In re Walton*, 866 F.2d 981, 983 (8th Cir.1989) (equating "substantial abuse" to "bad faith" would "duplicate other provisions of the code that have always required petitioners to file in good faith"). It provides:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).[6]

This Chapter 7 case will therefore be dismissed if the U.S. Trustee can demonstrate (1) that Mastromarino's debts are "primarily" consumer debts; and (2) that providing him a discharge in return for the surrender of his non-exempt assets constitutes a "substantial abuse" of Chapter 7.

### 2. Consumer Debts

■ Determining whether debts are "consumer debts" within the meaning of § 707(b) requires that § 101(8) be consulted. A "consumer debt" is defined as a "debt incurred by an individual primarily for a personal, family or household purpose." As explained in *In re Booth*, 858 F.2d 1051, 1055 (5th Cir.1988): "the test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit."

This so-called "profit motive" test appropriately characterizes secured and unsecured debts for § 707(b)'s purposes. *Id.; accord Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir.1988); *In re Dickerson*, 166 B.R. 480, 483 (Bankr.N.D.Ga.1993); *In re Nolan*, 140 B.R. 797, 801 (Bankr.D.Colo.1992); *In re Johnson*, 115 B.R. 159, 161 (Bankr.S.D.Ill. 1990); *see also In re Funk*, 146 B.R. 118 n. 6 (D.N.J.1992) (examining § 707(b) along with other Code provisions on dismissal); *see generally* Robert M. Thompson, *Consumer Bankruptcy: Substantial Abuse and Section 707 of the Bankruptcy Code*, 55 Mo.L.Rev. 247, 257–59 (1990) [hereinafter *"Thompson"*].

The U.S. Trustee effectively has demonstrated that, even prorating certain debts related to mixed use properties (*e.g.*, mortgage on home with office space), more than 80% of Mastromarino's scheduled debt is consumer debt and the number of consumer debts he owes far exceeds the number of his nonconsumer debts. Mastromarino does not contest the point.[7]

### 3. Substantial Abuse

To begin, we must confront the ambiguous notion of "substantial abuse" and divine its meaning from its legislative and historical context.

For years, access to bankruptcy protection was not limited in any significant fash-

---

6. Section 707(b) was part of the so-called "Consumer Credit Amendments" to the Bankruptcy Code contained in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 312(2), 98 Stat. 333 (1984). The original version provided for dismissal only on motion of the court, but the section was amended two years later to permit the United States Trustee to file § 707(b) motions. Bankruptcy Judges, United States Trustee, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, § 219(b), 100 Stat. 3100 (1986).

7. Cases applying the profit motive test differ as to at what point the extent of consumer debt becomes sufficient to meet § 707(b)'s "primarily" consumer debt requirement. *See generally In re Vianese*, 192 B.R. 61, 68 (Bankr.N.D.N.Y. 1996); 4 King, *Collier on Bankruptcy* ¶ 707.06 at 707–22 n. 13 (15th ed. 1996); 2 Epstein et al., *Bankruptcy* § 7–45(a) at 434 (1992); Note, *Bankruptcy: A Review of Recent Court Decisions Applying Section 707(b) of the Bankruptcy Code to Chapter 7 Proceedings*, 22 Mem.St.U.L.Rev. 549, 557 (1992) [hereinafter *"Applying § 707(b) "*]. Mastromarino's obligations exceed the "primarily" threshold under any test.

ion, and debtors "enjoyed a virtually unfettered right to a 'fresh start' under Chapter 7, in exchange for liquidating their nonexempt assets for the benefit of their creditors." *In re Green*, 934 F.2d 568, 570 (4th Cir.1991). However, in 1984 Congress moved to limit access to Chapter 7 under certain circumstances by adding § 707(b) to the Code. Section 707(b) provides that upon its own motion, or that of the U.S. Trustee, a court may dismiss an individual Chapter 7 case if the debts involved are "primarily consumer debts" and the court finds that granting relief would constitute a "substantial abuse" of the provisions of Chapter 7.

*In re Vianese*, 192 B.R. 61, 67 (Bankr. N.D.N.Y.1996) (footnote omitted). "Unfortunately, Congress did not define the term 'substantial abuse....' " *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991).

The vague statutory directive is the result of a fundamental tension between the Bankruptcy Code's traditional goal—granting the debtor an opportunity for a fresh start—and creditors' concerns born of perceived consumer credit abuses. *Id.* at 571; *see Thompson, supra*, at 249–50; *Fog, supra*, at 198–99.

Although the statute's eely texture has led courts "to rummage through the closet of the Congressional Record to find the legislative history that seems appropriate in the particular case," *Thompson, supra*, at 251–52, I agree with Judges Yacos and Hillman that § 707(b)'s legislative history does not illuminate the meaning of "substantial abuse" because "there simply is no legislative history in the ordinary sense as to the crucial language added and deleted in the final bill that emerged out of a conference committee with no separate conference analysis report." *In re Keniston*, 85 B.R. 202, 214–15 (Bankr. D.N.H.1988), *quoted in In re Snow*, 185 B.R. at 400; *see also In re Green*, 934 F.2d at 570–71.

Immediately after § 707(b)'s passage a debate ensued over whether a debtor's ability to pay his or her debts with future income should or should not be considered in the substantial abuse analysis. *See In re Keniston*, 85 B.R. at 214–15, 223; *In re Antal*, 85 B.R. 838, 840 (Bankr.W.D.Mo.1988); *In re Deaton*, 65 B.R. 663, 665 (Bankr.S.D.Ohio 1986); *cf. In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989); *In re Kelly*, 841 F.2d at 914; *In re Herbst*, 95 B.R. at 101; *Roadmap, supra*, at 1029–35. But the common concern of most reported cases is the debtor's ability to repay his or her debts with future income. *See, e.g., Fonder v. U.S.*, 974 F.2d 996, 999 (8th Cir.1992) ("the essential inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to make the Chapter 7 liquidation bankruptcy a substantial abuse of the Code"); *In re Green*, 934 F.2d at 572–73; *In re Krohn*, 886 F.2d at 126; *In re Walton*, 866 F.2d at 984 (collecting cases); *In re Kelly*, 841 F.2d at 914; *In re Snow*, 185 B.R. at 401; *In re Dominguez*, 166 B.R. 66, 68 (Bankr.E.D.N.C.1994); *In re Lee*, 162 B.R. 31, 37 (Bankr.N.D.Ga.1993); *In re Marshalek*, 158 B.R. 704, 708 (Bankr. N.D.Ohio 1993); *In re Scheinberg*, 132 B.R. 443, 445 (Bankr.D.Kan.1991), *aff'd*, 134 B.R. 426, 429 (D.Kan.1992). What debate remains focuses on the relative weight "ability to pay" should be given in relation to other factors that bear on the substantial abuse question. *See, e.g., In re Snow*, 185 B.R. at 400–01; *see generally Applying § 707(b), supra*, at 559–62.

Judge Hillman recently summarized the evolution and present state of substantial abuse analysis:

> The first relevant opinion by a court of appeals appears to be *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988). The court adopted what it described as

>> "the rule adopted by the overwhelming majority of the courts considering the issue ... that a debtor's ability to pay his debts will, standing alone, justify a section 707(b) dismissal."

> 841 F.2d at 914.

> The Eighth Circuit has adopted the *Kelly* approach. *In re Walton*, 866 F.2d 981 (8th Cir.1989). *See also United States Trustee v. Harris*, 960 F.2d 74 (8th Cir. 1989).

> The Sixth Circuit Court of Appeals has taken a broader approach:

"Those courts which have reviewed the legislative history, have generally concluded that, in seeking to curb 'substantial abuse,' Congress meant to deny Chapter 7 relief to the dishonest or non-needy debtor. In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his financial predicament war-. rants the discharge of his debts in exchange for liquidation of his assets. *Substantial abuse can be predicated upon either lack of honesty or want of need.*

. . . .

"Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone *may* be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worth [sic] of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other facts relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities."

*In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989) (citations omitted; emphasis added).

*Kelly* can be read to mandate dismissal given sufficient ability to pay. *Krohn* permits but does not require that result.

The Fourth Circuit expressly rejected the absolute rule of *Kelly*. *Green, supra*

at 572. Instead, it adopted the "totality of the circumstances" approach, which, it said

"Involves an evaluation of factors such as the following:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith."

*Id.*

There are many other decisions from the district and bankruptcy courts, but a review indicates that most can be reconciled with one or more of the circuit court decisions described above.

*In re Snow*, 185 B.R. at 401–02 (footnote omitted); *see also In re Vianese*, 192 B.R. at 67–69 (analyzing cases and factors); *see generally Thompson, supra*, at 254–57; *Fog, supra*, at 195–98; *Applying § 707(b), supra*, at 558–62.

 I will employ the "totality of the circumstances" approach because, whatever "substantial" abuse means, *c.f. In re Keniston*, 85 B.R. at 206 (questioning qualification of "abuse" by the term "substantial"), it implies that the bankruptcy court's analysis should involve weighing each debtor's circumstances case-by-case.[8] In assessing the debtor's circumstances, the ability to repay prepetition debt is an important factor. In some cases it *may* alone warrant dismissal. *In re Krohn*, 886 F.2d at 126.

 It is unnecessary to choose among the various formulations of "totality of the circumstances" analysis. Taken together they

---

8. Although resort to legislative history to illuminate the content of substantial abuse is unavailing, tracing progress of the legislation that eventually became § 707(b) readily demonstrates that Congress employed that term after rejecting a formulaic future income test for Chapter 7 eligibility. *See Applying Section 707(b), supra*, at 559; *Thompson, supra*, at 262 (detecting substantial abuse "necessarily involves the judge in the day-to-day financial life of the debtor").

address factors touching upon financial need (*e.g.*, income and expenses, budget, job/income stability); alternatives to liquidation bankruptcy (*e.g.*, Chapter 13 eligibility, state law remedies, prospects for negotiation); mitigating circumstances (*e.g.*, recent job loss, illness, disability or other "calamity"); aggravating circumstances (*e.g.*, lavish lifestyle, incurring credit and taking cash advances beyond ability to pay); and general "honesty" (*e.g.*, accuracy of schedules, forthright disclosure).[9]

### 4. Statutory Presumption

■ Section 707(b)'s concluding sentence provides that "[t]here shall be a presumption in favor of granting the relief requested by the debtor." Taking the statutory directive as an evidentiary presumption, particularly where the court initiates the § 707(b) proceeding, would be an awkward exercise. *See* Fed.R.Evid. 301; *see generally* Hon. Barry Russell, *Bankruptcy Evidence Manual* § 301.7 (1994–95); *cf. In re Love*, 61 B.R. 558, 559 (Bankr.S.D.Fla.1986) (poetically noting that *sua sponte* § 707(b) motions lack procedural rhyme and reason). Rather, the "presumption" represents a congressional admonition that bankruptcy relief is favored and that "the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present." *In re Kelly*, 841 F.2d at 917; *see In re Snow*, 185 B.R. at 402; *see also In re Green*, 934 F.2d at 572 (holding that in light of the presumption, ability to pay alone was not a sufficient basis for a finding of substantial abuse); *In re Strong*, 84 B.R. 541, 544

(Bankr.N.D.Ind.1988); *see generally Thompson, supra,* at 259–61.

■ I agree that the "debtor's schedules, executed under the pains and penalties of perjury, have significant evidentiary weight." *In re Snow*, 185 B.R. at 402. But if the schedules themselves demonstrate the debtor's ability to make "*very substantial* payments on unsecured indebtedness," *id.* at 403, *or* if the U.S. Trustee introduces other evidence of such ability (*e.g.*, by demonstrating the schedules do not accurately portray the debtor's ability to pay), the initial burden is met, the presumption "'vanishes entirely . . . and the question must be decided as any ordinary question of fact.'" *Id.* (quoting *Bank One v. Montle*, 964 F.2d 48, 51 n. 2 (1st Cir.1992)). At that point, with the ultimate burden on the moving party, *see In re Maylin*, 155 B.R. 605, 613 (Bankr.D.Me.1993), the court will consider all pertinent circumstances. *See, e.g., In re Green*, 934 F.2d at 572; *In re Johnson*, 115 B.R. at 164 ("[w]hile the 'ability to pay' test will be the Court's central focus, the question of whether substantial abuse exists must ultimately be determined on a case-by-case basis"); *accord. In re Herbst*, 95 B.R. at 98.

■ Generally speaking, although Chapter 13 eligibility is not essential to the § 707(b) calculus, the analysis proceeds by considering what payout to unsecured creditors would flow from a hypothetical Chapter 13 plan. *See, e.g., In re Johnson*, 115 B.R. at 164. Mastromarino invites such an exercise here.[10]

---

9. Although "bad faith" can trigger dismissal under § 707(a), in determining whether a debtor's resort to Chapter 7 constitutes substantial abuse, the court necessarily considers "honesty" as well as "need." *In re Krohn*, 886 F.2d at 126.

10. Debtor's Brief, Court Doc. No. 38, at 4–5. Mastromarino does not contend that Chapter 13 eligibility is a prerequisite to § 707(b)'s application. *In re Krohn*, 886 F.2d at 127; *In re Nolan*, 140 B.R. at 802; *In re Stratton*, 136 B.R. 804, 805 (Bankr.C.D.Ill.1991); *In re Scheinberg*, 132 B.R. at 446, *aff'd*, 134 B.R. at 430; *In re Bell*, 56 B.R. 637, 642 (Bankr.E.D.Mich.1986), *rev'd on other grounds* (unpublished district court opinion), 65 B.R. 575 (Bankr.E.D.Mich.1986) (holding that Chapter 13 was not a prerequisite to dismissal for substantial abuse and that debtor

was eligible to file a Chapter 11 petition). *But see In re Mastroeni*, 56 B.R. 456, 459 (Bankr. S.D.N.Y.1985) (holding that debtor's Chapter 7 petition did not constitute substantial abuse where debtor was ineligible for Chapter 13 relief and where Chapter 11 was unavailing because debtor had little assets and post petition income is not property of the estate in Chapter 11); *In re Williams*, 155 B.R. 773, 774 (Bankr.D.Idaho 1993) (same).

Although § 1306 includes post-petition income as property of the estate in Chapter 13, Chapter 11 contains no such provision. Hence, a Chapter 11 debtor may voluntarily surrender post-petition income to fund a plan, but he cannot be compelled to do so. *Compare In re Mastroeni*, 56 B.R. at 459 *with In re Scheinberg*, 132 B.R. at 446, *aff'd*, 134 B.R. at 430.

There remains uncertainty as to how one determines what percentage repayment of prepetition unsecured debt over what period of time constitutes the "very substantial" repayment capacity that may lead to a § 707(b) dismissal order. *See, e.g., Fonder,* 974 F.2d at 1000 (89% over 3 years and 100% over 5 years); *U.S. Trustee v. Harris,* 960 F.2d 74, 77 (8th Cir.1992) (156% over 3 years); *In re Walton,* 866 F.2d at 985 (more than 75% over 3 years and 100% over 5 years), *In re Snow,* 185 B.R. at 403 (81% over 3 years); *In re Sanseverino,* 171 B.R. 46, 49 (Bankr. N.D.Ohio 1994) (70% over five years); *In re Dickerson,* 166 B.R. at 483 (in excess of 50% over 3 years); *In re Faulkner,* 165 B.R. 644, 647 (Bankr.W.D.Mo.1994) (73.88% over 3 years); *In re Buntin,* 161 B.R. 466, 469 (Bankr.W.D.Mo.1993) (70.96% over 3 years); *In re Smith,* 157 B.R. 348, 351 (Bankr. N.D.Ohio 1993) (70% over 5 years); *see generally Fog, supra,* at 199–201.

Mastromarino argues that the evidence must show that he can repay 50% of his prepetition unsecured debt over five years to establish an ability to pay sufficient to rebut the statutory presumption that he is entitled to the relief he seeks.[11] Without holding that 5 years/50% should be the governing standard in all § 707(b) disputes, I will employ it here to determine Mastromarino's "ability to pay."[12]

### 5. *Applying the Standard*

■ Considering Mastromarino's individual circumstances, I readily conclude that to grant him Chapter 7 relief would constitute a substantial abuse of the Code's liquidation bankruptcy provisions.

Mastromarino's monthly disposable income is $9,626.00. After expenses, he claims he has but $66.00 available to repay creditors. He posits that to pay unsecured creditors 50% of their claims over five years he would have to fund a Chapter 13 plan with monthly payments of $3,120.00—an impossible task. But a critical review of his monthly expenses expands the realm of possibility considerably.

Mastromarino's projected expenses are premised entirely on his "responsibility" for housing, clothing, feeding and fostering the welfare of a family of six, plus paying $3,600.00 per month in child support and alimony to his ex-wife.[13] He has offered no evidence regarding what reasonable expenses he might incur living as a single man.

■ I will disregard both the additional household income and the household expenses attributable to Mastromarino's choice to live with and support his domestic partner and her four children.[14] This is not a moral judgment, but a legal one. Mastromarino has *no* obligation to support them. But he *is* legally obligated to his creditors. To grant such voluntary expenditures priority over existing legal obligations would be to permit Mastromarino unilaterally to subordinate his creditors to his personal lifestyle choices. That he may not do. *See In re Davidoff,* 185 B.R. 631, 635–36 (Bankr.S.D.Fla.1995) (dismissing debtor's Chapter 7 case for cause under § 707(a) where debtor supported his

---

In any event, it appears that Mastromarino was eligible for Chapter 13 relief on the date he filed his petition. *See* § 109(e) (setting limits for Chapter 13 eligibility for unsecured debt and secured debt at $250,000.00 and $750,000.00, respectively).

11. Debtor's Brief, Court Doc. No. 38, at 4.

12. Some have advocated adopting a fixed standard that the debtor's demonstrated ability to pay a certain percentage of unsecured debt over a given period of time demonstrates substantial abuse under § 707(b). *See e.g., Roadmap, supra,* at 1029–35 (100% over 3 years); *Fog, supra,* at 200–202. Others point out that an inflexible standard can be evaded by advance planning and might operate without regard to the essential fairness that the substantial abuse provision was

meant to address. *See Thompson, supra,* at 263–64 (favoring restrained resort to substantial abuse dismissals but noting that rule of thumb in reported cases appears to be 50% over "life of the plan").

13. For example, he lists monthly expenses of $2,651.00 for housing (including utilities), $650.00 for food, $896.00 for health care and $1,519.50 for transportation (two cars). Relying on the U.S. Department of Labor's Consumer Expenditure Survey for 1994, the U.S. Trustee points out that such expenses appear unreasonably high—even for a family of six. U.S. Dep't of Labor, *Consumer Expenditure Survey, 1994* (1995) (Table 1800); Ex. 8.

14. Mastromarino's partner's after tax monthly income is $1,089.00.

adult children and included in his expenses support for his second wife's child who was not his dependent and for whom wife received child support payments); *In re Richmond*, 144 B.R. 539, 542 (Bankr.W.D.Okla. 1992) (finding excessive expenditures where debtors voluntarily supported their grandchildren); *In re Nolan*, 140 B.R. 797, 803 (finding that debtor could reduce his expenses by eliminating payments for his son's private school and for life insurance on his children); *In re Jones*, 55 B.R. 462, 467 (Bankr.D.Minn.1985) (finding that debtor could reduce her expenses by eliminating payments for her children's college education and private secondary school); *see also In re Messenger*, 178 B.R. 145, 149 (Bankr. N.D.Ohio 1995) (staying dismissal to permit debtor to prove that he was legally obligated to contribute to the support of his adult disabled child); *cf. In re Gonzales*, 157 B.R. 604, 610 (Bankr.E.D.Mich.1993) (payment of college tuition for debtor's 19 and 21 year old children were reasonable expenses in her Chapter 13 budget); *In re Tefertiller*, 104 B.R. 513, 515 n. 1 (Bankr.N.D.Ga.1989) (declining to find substantial abuse where debtors' budget included expenses for the support of a 21 year old child: "[t]hough they have no legal duty to support their daughter, debtors may find a moral responsibility to do so. Such support is not an intentional act to deprive their creditors or enrich themselves"); *In re Wegner*, 91 B.R. 854, 859 (Bankr.D.Minn.1988) (finding that "debtors were motivated by charity and a sense of moral, if not legal, responsibility for their family, not by any attempt to ... deprive their creditors" where debtors were supporting two adult children, their daughter-in-law and their grandchildren).

Putting aside alimony, support and school tuition for his own two children,[15] $5,776.00 remains available for living expenses and debt repayment.[16] Accepting Mastromarino's contention that he would have to devote $3,120.00 per month to fund a five-year, 50% Chapter 13 plan, doing so would leave him $2,656.00 in hand for monthly personal expenses. That sum, aggregating $31,872.00 per year, is not unreasonably paltry for a single man to live on while he repays his debts under Chapter 13 protection.[17]

I conclude, then, that, employing the analytical model and repayment standard that

**15.** Mastromarino sets school tuition at $333.00 per month. Assuming a nine-month school year, his prorated monthly tuition expense would be $249.75, rounded to $250.00 for present purposes.

**16.** I have not accepted the U.S. Trustee's invitation to disregard any portion of Mastromarino's alimony and support obligations on the theory that they represent too generous an arrangement that prefers his ex-wife and family over creditors. Outside the limited contexts of dischargeability disputes, *cf., e.g.,* § 523(a)(5) (exception to discharge for debts "in the nature of" alimony and support); *In re Warren*, 160 B.R. 395 (Bankr. D.Me.1993) (what is nondischargeable as alimony or support is determined by federal law), and priority determinations, *cf., e.g.,* § 507(a)(7) (priority status for alimony and support obligations), this court accepts state domestic relations obligations as established by the state court judgments. *See generally,* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4469 (1981).

I do note that it is possible that, in the context of a Chapter 13 plan, a debtor, or perhaps another party-in-interest, might seek a determination that all or part of a purported alimony or support arrearage is not actually such and that, as a result, it is without § 507(a)(7)'s priority and therefore not entitled to § 1322(a)(2)'s "full payment" requirement. However, notwithstanding the fact that Mastromarino's support and alimony *arrearages* might be subject to adjustment under those Code sections, he had accrued no such arrearages as of his bankruptcy filing.

**17.** In the usual § 707(b) case, ability to pay starts with deducting reasonable expenses from net income after taxes to find disposable income. Then the court considers whether there is sufficient disposable income to fund a meaningful repayment plan. *See, e.g., In re Walton*, 866 F.2d at 985; *In re Dickerson*, 166 B.R. at 483–84; *In re Nolan*, 140 B.R. at 803 & n. 7.

Mastromarino contends that expenses for a family of six are his "reasonable" expenses. He has proffered no evidence of what reasonable expenses for himself would be. As a result, my analysis must proceed by a different route. From net income after taxes I have deducted alimony, child support and related obligations and the $3,120.00 per month that a 5 year/50% plan would require. With that done, I am left with the question whether a single man might reasonably live on the balance. On this record, I readily conclude he can. In other words, I conclude that Mastromarino has *at least* $3,120.00 of disposable income with which to fund a repayment plan.

Mastromarino urges, he possesses an "ability to repay" his prepetition obligations. With that in mind, I next evaluate all other pertinent circumstances.

Mastromarino points out that he filed for bankruptcy after an expensive divorce. As far as it goes, that's true. But the divorce resulted in expensive obligations only because he had, and retains, the ability to pay them. Moreover, Mastromarino entered into a divorce settlement agreement that transferred a substantial portion of his net worth to his ex-wife *and* established what might be termed exceedingly generous levels of alimony and support at a time when he already faced most all of the debt he brought to bankruptcy.

Mastromarino lost his job just before filing bankruptcy, too. But he landed a new, and only slightly less lucrative job, almost at once.

It is true that part of Mastromarino's financial troubles are attributable to his being hoodwinked by a man he employed to restore and refit his yacht and that before filing bankruptcy Mastromarino did make a brief attempt to reach an arrangement with his creditors through the offices of the Consumer Credit Counseling Services. But the former fact can scarcely be termed a "calamity" and the latter, although positive, hardly outshines other circumstances.

Although I accept Mastromarino's divorce transfers and obligations at face value,[18] the settlement terms do not reflect concern for his creditors. And, although Mastromarino was engaged in several losing business ventures, he may well have done so to shelter taxable income. His records for those businesses are, at best, incomplete.[19]

A review of Mastromarino's post-filing checking account records discloses continuing payments of $250.00 per month for personal goods storage[20] and large unexplained monthly payments to an entity known as the "Hogan Family Partnership."[21] Such ongoing expenditures cast serious doubt on Mastromarino's lament that, even assuming the necessity of supporting a household of six, he has but $66.00 per month in disposable income.

On balance, the circumstances weigh heavily in favor of the U.S. Trustee's motion. I do not agree that Dr. Mastromarino's support of unrelated housemates before paying his creditors is reasonable. I do not believe that he has been forthcoming in assessing his personal finances. I am left with the impression that, although this debtor has considerable debt, he also has a very substantial capacity to repay it.

### Conclusion

For the reasons set forth above, the U.S. Trustee's motion to dismiss is granted, with the condition that the order of dismissal will be effective in ten days unless the debtor sooner converts his case to Chapter 13.[22]

---

18. *See supra* note 16.

19. The U.S. Trustee points to historical deposits into business accounts that far exceed the gross receipts reported for those enterprises during the tax years in which they were made.

20. *E.g.,* Ex. Q1 (Check No. 1059, dated 9/30/95: $125.00; Check No. 1060, dated 9/30/95: $125.00).

21. Ex. Q1 (Check No. 1012, dated 9/7/95: $4,000.00; Check No. 1031, dated 9/15/95: $1,500.00; Check No. 1141, dated 10/30/95: $1,490.00; Check No. 1238, dated 11/28/95: $1,500.00).

22. *See supra* note 10.