**In re Brandon Edward MOONEY and Brenda Louise Mooney, Debtors.**

No. 04–60575.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Aug. 9, 2004.

Deborah E. Booher, Akron, OH, Counsel for debtors.

Amy L. Good, Cleveland, OH, Counsel for the Office of the United States Trustee.

## MEMORANDUM OF DECISION

RUSS KENDIG, Bankruptcy Judge.

This matter comes before the court upon a motion to dismiss pursuant to 11 U.S.C. § 707(b) of the United States Bankruptcy Code[1] filed by Saul Eisen, United States Trustee (hereafter "Trustee"). Brandon and Brenda Mooney (hereafter "Debtors")

---

1. Unless otherwise stated, references to "the Code" or "the Bankruptcy Code" are to Title 11 of the United States Code. Unless other-

wise stated, a reference to a "section" is a reference to a section within the Bankruptcy Code.

responded and a hearing was held on June 7, 2004.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O).

## FACTS AND ARGUMENTS

Debtors filed their voluntary Chapter 7 petition on February 12, 2004. Schedule A of the petition reveals that Debtors own real estate in Wooster, Ohio with a declared market value of $190,000.00 (hereafter "Residence"). Schedule D indicates that Debtors owe approximately $200,000.00 in secured debt, $181,390.00 of which is a mortgage on the Residence. Debtors' unsecured debts total $74,992.00 of which $25,000.00 is for student loans. Debtors list their net monthly income at $6,240.04 and total monthly expenditures at $6,319.42. Debtor-wife is a medical laboratory technician at Wooster Community Hospital and Debtor-husband is a physician assistant at Ohio Heart Care. Debtors have an interest in a now defunct business called Epicurean, and the wife holds an interest in the Ohio public employees retirement system with a value listed at $63,799.00. Debtors have two children, ages nine and twenty-two months.

Some of Debtors' expenditures listed in Schedule J were objectionable to the Trustee. Trustee draws the court's attention to payments for mortgage, taxes and insurance on Debtors' residence totaling $1,759.42 per month, internet access charges and cell phone expenses totaling $160.00, food at $700.00 per month, transportation at $350.00 per month, auto maintenance/repairs at $80.00 per month, child care at $900.00 per month, clothing at $150.00 per month, laundry and dry cleaning at $80.00 per month, and water softener/trash removal at $170.00 per month. Trustee argues that Debtors have inflated expenses and possess the ability to repay some of their unsecured debt.

Debtors responded by addressing the expenses critiqued by the Trustee. Debtors contend that forty dollars for internet access is not excessive since schools routinely assign homework which requires use of the internet. Further, half of Debtors' $120.00 monthly cell phone expense is attributable to the husband's job which requires him to be available at all times. Debtors contend that $700.00 per month for food is not excessive since the IRS allows $856.00 per month for delinquent taxpayers whose monthly tax repayment plan is based on the IRS allowable living standards. Debtors also argue that the IRS standards allow for a greater amount to be spent on clothes and dry cleaning than Debtors have budgeted. In their response to the Trustee's objection, Debtors attached an exhibit which lists in detail, among other things, the child care expenses incurred in a typical month. This exhibit lists a zoo membership, two magazine subscriptions dealing with wine making, dog treats and $63.50 in overdraft fees as monthly expenses. Debtors contend that the available case law indicates that Debtors are not substantially abusing the provisions of Chapter 7 and Debtors should be allowed to remain in that Chapter.

## ANALYSIS

### I. Legal Standard

#### A. Legislative History of 11 U.S.C. § 707(b).

The text of 11 U.S.C. § 707(b) reads as follows:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

11 U.S.C. § 707(b). The amendment which added subsection (b) to section 707 was enacted in 1984 along with several other consumer credit amendments. These amendments were passed in response to less than needy debtors filing Chapter 7 bankruptcies. *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989). The amendment to section 707, as originally drafted, contained a formula to determine when a debtor's ability to repay debt would exclude him from Chapter 7. *In re Walton*, 866 F.2d 981, 984 (8th Cir.1989) (quoting Block–Lieb, *Using Legislative History to Interpret 1984 Amendments to §§ 548 and 707*, Norton Bankruptcy Law Advisor, October, 1986, No. 10.); *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914 (9th Cir.1988). This formula was eliminated from the final version in favor of a "substantial abuse" standard. *Kelly*, 841 F.2d at 914. The case of *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985) contains a detailed analysis of the legislative history, particularly the floor debates, surrounding the enactment

of section 707(b). The *Grant* court concluded that when making a substantial abuse analysis, the future income potential is important in determining what debts can be repaid. *Id.* at 391. Congress, the court reasoned, was determined to reduce the number of debts which were discharged by consumers who were able to repay a portion of them. *Id.* Section 707(b) was intended to permit the truly needy to obtain a "fresh start" and ensure that abusers would be denied a "head start." *Id.*

**B. Standard for Dismissal Under 11 U.S.C. § 707(b).**

■ Using the legislative history as a guide, courts have split on whether the ability to pay, by itself, will support a finding of substantial abuse, or whether other circumstances must be considered as well. The rule in the Sixth Circuit is that substantial abuse can be founded upon *either* a lack of honesty *or* want of need. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir.2004); *In re Krohn*, 886 F.2d 123, 127 (6th Cir.1989). *But see Stewart v. United States Trustee (In re Stewart)*, 175 F.3d 796, 809 (10th Cir.1999) (adopting a totality of the circumstances test to determine substantial abuse). Trustee does not allege that Debtors lacked honesty in filing under Chapter 7. Therefore, the court will focus on whether Debtors are needy.

■ "Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal." *Krohn*, 886 F.2d at 127 (citation omitted). Courts often look to whether a debtor would have disposable income to fund a Chapter 13 plan in evaluating debtor's ability to pay. *Behlke*, 358 F.3d at 436; *Walton*, 866 F.2d at 985 ("Although the statute does not

mandate a future income test, we are satisfied that it does not preclude the consideration of future income in giving meaning to the 'substantial abuse' standard.''). The Sixth Circuit stated in *Behlke* that "there is no 'cutoff' or bright-line test under which an ability to pay a certain percentage over a three-to-five year period would or would not be substantial abuse regardless of other circumstances." *Behlke*, 358 F.3d at 438 (noting that bankruptcy courts have found substantial abuse when debtor possessed the ability to repay as little as 5% or 11% and as much as 35% or 42%).

The decision in *Behlke* is the latest word from the Sixth Circuit on dismissal under 11 U.S.C. § 707(b). The bankruptcy court dismissed the Behlkes' case because they had disposable income with which to fund a plan once 401(k) contributions were included in the calculation. *Id.* at 431. The court stated that a finding of dishonesty is not necessary for dismissal, and that ability to pay could, by itself, be enough. *Id.* at 434–35. In concluding that the debtors had substantially abused the provisions of Chapter 7, the court of appeals quoted the lower court's decision which stated that in addition to debtors' ability to pay 14% over three years in a Chapter 13, debtors had a steady income and were not forced into bankruptcy by a catastrophic or unforeseen event but rather by self-imposed credit card debt. *Id.* at 437. Finally, although debtors did not live extravagantly, they did not live an austere lifestyle either. *Id.* These facts, along with debtors ability to repay 14% over three years, led the court to conclude that the Behlkes were not needy. *Id.* at 438. Granting the Behlkes a Chapter 7 discharge would be a substantial abuse of the provisions of that chapter and their case was dismissed. *Id.* at 438.

■ One last factor which must be considered when dismissing a case under 707(b) is the presumption in favor of the debtor. According to the text of 11 U.S.C. § 707(b), there is a "presumption in favor of granting the relief requested by the debtor." This presumption can be overcome by a showing of dishonesty, lack of need or the ability to pay. *Harris v. United States Trustee (In re Harris)*, 279 B.R. 254, 259 (9th Cir. BAP 2002). Colliers states that "the statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case." 6 Lawrence P. King, Collier on Bankruptcy, P 707.04[5][a], at 707–26 (15th ed. Rev.2001). The *Harris* court declined to read into the statutory presumption a heightened standard of proof, finding instead that substantial abuse can be found by a preponderance of the evidence. *Harris*, 279 B.R. at 260. Another court has stated that the presumption embodies the view of Congress that bankruptcy relief is the favored result, and a court should give debtor the benefit of the doubt and dismiss only when substantial abuse is clear. *In re Mastromarino*, 197 B.R. 171, 177 (Bankr.D.Me.1996). If the trustee can introduce some evidence of ability to pay, the presumption vanishes. *Id.* The interpretation of the presumption is irrelevant in this case due to the volume and weight of the evidence.

## II. Legal Standard Applied to This Case

### A. Debtors' Debts are Consumer in Nature

■ Section 707(b) will only operate to dismiss a case where the debts at issue are primarily consumer debts. Neither party has raised this as an issue, presumably because the debts at issue in this case clearly meet this requirement. Debtors have $275,022.00 in debt, and $190,000.00

of this is a mortgage on Debtors' residence. Debt incurred to purchase a home or make home improvements is consumer debt. *In re Dickerson*, 166 B.R. 480, 483 (Bankr.N.D.Ga.1993). Further, $11,000 in secured debt was incurred to finance Debtors' vehicles and Debtors have incurred much credit card debt. Thus, although some of Debtors' debt may have been incurred in conjunction with the operation of their now defunct business, The Epicurean, this debt constitutes only a small portion of Debtors' total debt, not enough to change its consumer nature.

### B. Debtors' Lifestyle

█ Of great concern to the court is Debtors' lifestyle which is largely responsible for their predicament. Debtors' Statement of Financial Affairs reveals a combined $86,717.00 in gross income for the year 2003. However, an examination of Schedule I shows a combined gross income of $95,975.64 once Debtors' total gross monthly income is multiplied by twelve. According to 2002 census data, the median family income in Ohio was $49,299.00. U.S. Census Bureau, 2002 American Community Survey, *available. at* http://www.census.gov/acs/www/Products/ Ranking/2002/R14T040.htm. Perhaps even more telling, the census data for Wooster, Ohio, show that only 22% of families living in Wooster have an income of $75,000.00 or higher. U.S. Census Bureau, 2000, *available at* http://censtats.census.gov/data/OH/1603986548.pdf. Only 13% of families in Wooster have an income of $100,000.00 or higher. *Id.* The median family income for Wooster is slightly lower than that of the state at $47,118.00. *Id.*

This data indicates that Debtors are financially far better situated than most of the families living in the Wooster area. One would conclude from this that Debtors should be able to provide a comfortable life for themselves and their children absent unforeseen or catastrophic events.

Debtors correctly point out that Debtor-husband was unemployed for part of 2002, but this does not fully explain why Debtors have been unable to pay their debts. The underlying problem is that Debtors have chosen to consistently live at or near the outer limits of their financial means. The primary example of this is Debtors' decision to live in a house which they could not afford or could barely afford in good times. The Wayne County Auditor website lists the value of Debtors' property at $200,650.00–$31,250.00 for· the land and $169,400.00 for the improvements upon the land. Wayne County Auditor, *Available at* http://www.waynecounty auditor.org/ wayne208/LandRover.asp. In Schedule J, Debtors list their monthly mortgage payment, including taxes and insurance, at a whopping $1,759.42. While this might seem relatively modest in many areas, this is a very nice house in this area.

Debtors argue that this is a very average house for the Wooster area and not a luxury home. The census data does not support this assertion. Of the owner-occupied units sampled in the Wooster area, only 9.7% had a value of $200,000 or greater and only 23.3% of homes had a value of $150,000.00 or greater. U.S. Census Bureau, 2000, *available at* http://censtats.census.gov/data/OH/1603986548.pdf. Additionally, of the 64.4% of homes in Wooster with a mortgage, only 26% of these have a mortgage of greater than $1,000.00 per month. *Id.* These numbers demonstrate that Debtors live in a house which is valued in the upper echelon of homes in the area and that they pay a higher mortgage than most area residents.

Of course, there is nothing inherently wrong in owning an expensive home. However, if the mortgage payment on that home is so large that a debtor falls behind

in payments to other creditors, eventually seeking to discharge most of these debts in Chapter 7, *while still keeping the house,* this would be a substantial abuse of the provisions of Chapter 7. *See Shaw v. United States,* 310 B.R. 538 (M.D.N.C.2004) ("[Debtors] insistence on making such large mortgage payments manifests a desire to hold on to a certain station of life, a desire that seems to have caused many of their problems in the first place."). More significantly, the balance of Debtors' schedules reveals no other sacrifice to make a nicer home economically feasible.

The court is not concluding that Debtors' house is ostentatious or extreme. Rather, like much of Debtors' lifestyle, it is calculated to go to the very edge. The problem is not just the house. It is a large house combined with persistent and pervasive financial frittering that is outlined hereafter. This case provides an excellent backdrop for the thesis that two income families must save regularly or the risk of insolvency is greater. First, the odds of job loss are twice as high when two are employed. Second, the short term fix of the other party obtaining work for some time is not available. Elizabeth Warren, *The New Economics of the American Family,* 12 Am. Bankr.Inst. L.Rev. 1 (2004). Two income families are particularly less secure than one if all of the income is committed to fixed expenses.

These are not financially and occupationally hampered debtors who have fallen on tough times and desperately need a fresh start. Debtors decided to live at or just beyond what their means will allow and have used their unsecured creditors to help accomplish this. Although there was a period of unemployment, Debtors' schedules reveal that they spend everything that they make, even in good times. Debtors show no signs that they are going to relinquish the spending pattern that brought them to the bankruptcy court. They are keeping their house, along with its $1,759.42 in monthly payments. To allow Debtors to discharge the debt owed to their unsecured creditors while attempting to keep their current lifestyle intact would frustrate the designs of Congress in enacting Chapter 7 by allowing Debtors to get a head start rather than a fresh start. Debtors fall within the group of people which Congress sought to preclude from receiving a Chapter 7 discharge when it enacted § 707(b).

### C. Adequacy of Income and Belt Tightening

Although Debtors' lifestyle and refusal to alter it are sufficient to warrant dismissal, an independent ground exists in Debtors' ability to repay some of their debts along with the absence of mitigating circumstances. The court will now examine Debtors' expenses to see if some "good, old-fashioned belt tightening" will result in money available to unsecured creditors. *See Krohn,* 886 F.2d at 128. In order to determine whether a debtor has the ability to pay, courts generally look to the debtor's scheduled expenses to see if they are excessive. *See e.g. In re Walsh,* 287 B.R. 154 (Bankr.E.D.N.C.2002) (noting that private school, hockey and country club expenses were excessive); *In re Christie,* 172 B.R. 233 (Bankr.N.D.Ohio 1994) (finding that recreation, entertainment expenses and gift expenses were excessive). Without examining every expense questioned by Trustee, the court finds that Debtors are able to trim some fat off of their $6,319.42 monthly budget and make a meaningful repayment to unsecured creditors. The following are expenses which the court finds worth mentioning as places where Debtors might first try to tighten their belts.

One expense which immediately stands out on Debtors' schedule J is the $900.00 per month in child care expenses. Debtors have two children ages nine and twenty-two months. Debtors presented into evidence a detailed itemization of their monthly expenses, including child care. The list appears unusually heavy during this "test month" in order to justify the $900.00 in child care expenses listed in their schedules. Debtors' itemization is attached as an exhibit to this decision.

■ Other listed expenses seem high. Cell phone and internet expenses of $160.00 per month are high. Debtors contend that $120.00 of this goes toward cell phone bills and $55.50 of this is Debtor-husband's cell phone which his job requires him to carry. Although having a cell phone is not *per se* excessive, paying $120.00 per month is. This is the cost of two deluxe plans with a phone included. Debtors contend that school assignments require the forty dollar per month internet connection. Forty dollars per month is enough to purchase a broadband internet connection. If some internet connection is essential for schoolwork, a less expensive dial-up connection must suffice when times are bad. Further, Debtors' entertainment expenses appear to be excessive as well. One hundred dollars per month for entertainment purposes has been found excessive by several courts. *In re Wray*, 136 B.R. 122, 125 (Bankr.W.D.Pa.1992) ($58.00 per month in recreation and charitable expenses was excessive); *In re Goodson*, 130 B.R. 897, 901–02 (Bankr.N.D.Okla.1991) ($100.00 in recreation expenses was excessive); *In re Roth*, 108 B.R. 78, 80 (Bankr. W.D.Pa.1989). Finally, Debtors' itemized list of monthly expenses reveals that Debtors spend $85.01 per month on a furniture loan payment. Like many strapped individuals in this court, Debtors apparently spent everything building the dream house and had no funds left to put furniture in it.

Overall, Debtors' monthly budget is excessive considering the dire financial straits which they are in. There is virtually no concrete standard. Ultimately, the courts are asked to weigh an infinite number of variables and circumstances and declare, "too much." There is nothing wrong with a nice home, multiple premium cell phone services, high speed internet access, zoo memberships, wine magazine subscriptions, dog treats, dog dental care items and more. There is something wrong when these expenses continue and unpaid creditors are told by the bankruptcy court to shinny up a cactus. Debtors are able to tighten their belts, scale back the lifestyle to which they have accustomed themselves, and make a meaningful repayment to unsecured creditors. Excluding student loans, Debtors owe $49,510.00 in unsecured debt. Small sacrifices would enable them to make a meaningful distribution.

**D. Debtors Are Not Needy**

■ Although the Sixth Circuit has made it clear that the ability to pay alone can warrant a finding of substantial abuse, it is also appropriate to look to additional factors which could indicate whether a particular debtor is needy. These factors include whether debtors have a stable income, whether debtors' expenses can be reduced without depriving them of basic living necessities, whether debtors are eligible for relief through Chapter 13 of the Bankruptcy Code, and whether debtors' financial situation is the result of an unforeseen, catastrophic event. *See Behlke*, 358 F.3d at 437; *Krohn*, 886 F.2d at 126. In the present case, there was no evidence presented to the court that either of the jobs which Debtors hold is in danger of vanishing. Nor was any evidence present-

ed that Debtors expect any substantial income fluctuations in the foreseeable future. Debtors are eligible for Chapter 13 relief. Finally, as discussed above, Debtors can reduce their expenses without depriving themselves or their children of life's necessities.

■ There is no evidence that Debtors were forced into bankruptcy due to an unforeseen catastrophe.[2] It is true that Debtor-husband lost his job for approximately six months in the year 2002. No explanation was given as to the amount of unemployment that was received or the extent of the debt that was incurred for necessities during this time period. There must be a logical nexus between unforeseen events and the filing of bankruptcy for those events to mitigate against dismissal under 707(b). *In re Pier*, 310 B.R. 347 (Bankr.N.D.Ohio 2004) (noting that although the loss of debtor's house had a "clear nexus" with the bankruptcy, debtor-wife's quitting of her job due to debtors moving some distance away to find housing did not). In this case, such a nexus is lacking. Debtors gave some evidence that it was this event which heightened their financial difficulties that eventually led to their filing bankruptcy. However, Debtors' financial choices, not the unemployment in and of itself, allowed this work interruption to lead to bankruptcy. *See Walton v. Smith (In re Smith)*, 229 B.R. 895, 898 (Bankr.S.D.Ga.1997) ("The petition filing was caused by the Debtors' failure in the three years prior to this filing to

reduce their expenses and live within their means, not by [debtor's] employment termination [three years prior to filing].") In this case, Debtor-husband's unemployment occurred over a year prior to the filing. His current job pays more than his old job. Therefore, this is not a case where Debtors' attempt to discharge unsecured debt was caused by a catastrophic event but rather, by their own poor decisions. Debtors are not needy. Doubtless many Americans would exchange their present and future for Debtors' excellent job skills and $95,000 income in Wooster, Ohio.

Stated differently, a period of job loss does not constitute grounds for filing Chapter 7 when highly compensated debtors return to work at even better wages on these facts. In such circumstances, it is fair to require some repayment to creditors.

Finally, the court notes with some chagrin Debtors' approach of metaphorically throwing down the checkbook and saying, "Show us where we need to cut." The problem is that the consequence of excessive lifestyle is such that it is most difficult to cut the largest expenses without forcing the least desirable result. The example in this case is the large home encumbered with large secured debt and a correspondingly high payment. Were Debtors in an average home in their community, they would easily have hundreds of dollars more per month. Now that they are totally uncreditworthy, would the court force their children into an apartment?[3]

---

**2.** Although *Krohn* uses the presence of unforeseen or catastrophic circumstances to determine whether debtors are dishonest under 707(b), this factor is highly probative of whether debtors are needy. *See Behlke*, 358 F.3d at 436–37 (quoting the lower courts discussion of "other factors relevant to determining whether the debtors were 'needy'" which included whether an unforeseen or catastrophic event precipitated the bankruptcy fil-

ing). Certainly a debtor who experiences a catastrophe will be more needy than a similarly situated debtor who has not.

**3.** The subtext of many housing related discussions is the desire or need for parents to place their children in safe and academically competitive public schools. This often means leaving affordable, older urban housing for higher priced housing in certain school dis-

A typical example not present in this case is joint debtors with two relatively new cars with very high payments due to negative equity from multiple, previous excessive auto purchases being rolled into each succeeding loan. One of these hypothetical debtors drives a one year old Cadillac SUV with a monthly payment of $700, and the spouse is similarly situated. Now that their credit is destroyed, would the court force them to purchase unreliable vehicles at the "buy here—pay here" when one or both jobs are sixty miles away?

In both instances, the behavior that created the problem now becomes the excuse. We are not dealing with factory workers without health insurance whose plant closed and job skills are limited to assembly work or a punch press. These cases often involve talented, skilled people with bright futures.

Perhaps the percentage of repayment is smaller because the court won't force a debtor out of a nice home or car, but lifestyle cannot be permitted to be both the problem and the excuse. At certain levels of income, it is incumbent upon higher income debtors who are not experiencing any ongoing calamity to accept responsibility and pay *something*, even if it is less than it should be due to retention of a large, secured debt.

Debtors in this case are intelligent, talented, likable, and possess a bright future. It is incumbent upon them to contribute something from this future for their past debts or the relief would be inappropriate. Debtors may still have their discharge, but they must repay a portion of their debt in Chapter 13 to receive it. Three factors are the most compelling. First, Debtors have excellent incomes. Second, Debtors have excellent future prospects given their job skills and current positions. Third, Debtors can make a meaningful effort at repayment without restricting fundamental necessities.

## CONCLUSION

The court grants the Trustee's motion pursuant to 11 U.S.C. § 707(b). Debtors are provided thirty (30) days to convert to Chapter 13 or the case will be dismissed.

An appropriate order shall enter.

## EXHIBIT C

| Item | Cost | #/Month | Total |
|------|------|---------|-------|
| **Pet Expenses** | | | |
| Dog Food | $33.96 | 1 | 33.96 |
| Dog Treats | $ 2.64 | 1 | 2.64 |
| Dog Shampoo | $ 7.45 | 1 | 7.45 |
| Rabbit Food | $ 4.97 | 1 | 4.97 |
| Dental Care Bone | $ 3.77 | 1 | 3.77 |
| | | | 52.79 |
| | | | |
| **Household Expenses** | | | |
| Hand Soap | 4.97 | 1 | 4.97 |
| Trash Bags | 5.94 | 1 | 5.94 |
| Lawn Bags | 7.94 | 1 | 7.94 |
| Toilet Paper | 5.96 | 1 | 5.96 |
| Paper Towels | 2.78 | 2 | 5.56 |
| Napkins | 2.84 | 1 | 2.84 |
| Paper Plates | 1.97 | 2 | 3.94 |
| Facial Tissue | 2.84 | 2 | 5.68 |
| Dishwasher Soap | 5.44 | 1 | 5.44 |
| Liquid Dish Soap | 1.97 | 1 | 1.97 |
| Light Bulbs | 12.98 | 1 | 12.98 |
| Water Softner Salt | 6.36 | 1 | 6.36 |

tricts. This is not the case in Wooster, Ohio. The city schools enjoy an excellent reputation and Debtors' home, built in 2001, is in the city school district.

| | | | |
|---|---|---|---|
| Water Softner Payment | 71.33 | 1 | 71.33 |
| Furniture Loan Payment | 85.01 | 1 | 85.01 |
| | | | 225.92 |

**Laundry & Dry Cleaning**

| | | | |
|---|---|---|---|
| Laundry Detergent | 9.48 | 2 | 18.96 |
| Fabric Softner | 7.96 | 1 | 7.96 |
| Dryer Sheets | 4.27 | 1 | 4.27 |
| Bleach | 1.68 | 3 | 5.04 |
| Dress Pants | 4.25 | 10 | 42.5 |
| Ties/Dress Shirts | 2.25 | 4 | 9 |
| Suits/Sport Jackets | 12.25 | 2 | 24.5 |
| | | | 112.23 |

**Personal Grooming**

| | | | |
|---|---|---|---|
| Shampoo | 6.18 | 2 | 12.36 |
| Conditioner | 2.86 | 1 | 2.86 |
| Soap | 4.92 | 1 | 4.92 |
| Medicated Soap | 4.97 | 2 | 9.94 |
| Deodorant | 2.34 | 3 | 7.02 |
| Hair Gel | 2.47 | 1 | 2.47 |
| Hair Spray | 3.32 | 2 | 6.64 |
| Razors | 2.94 | 2 | 5.88 |
| After Shave Lotion | 2.12 | 1 | 2.12 |
| Shaving Cream | 3.58 | 1 | 3.58 |
| Toothpaste | 2.94 | 2 | 5.88 |
| Mouthwash | 5.87 | 1 | 5.87 |
| Maxi Pads | 6.83 | 1 | 6.83 |
| Athlete Foot Medicine | 11.87 | 1 | 11.87 |
| Foot Powder | 3.57 | 1 | 3.57 |
| Hair Cuts/Styling | 32 | 1 | 32 |
| Condoms | 5.18 | 1 | 5.18 |
| | | | 128.99 |

**Postage/UPS**

| | | | |
|---|---|---|---|
| Shipping | $ 24.95 | 1 | 24.95 |
| Stamps | 12.3 | 1 | 12.3 |
| | | | 37.25 |

**Bank Fees**

| | | | |
|---|---|---|---|
| Online Banking Fee | 5.95 | 1 | 5.95 |
| Overdraft Fees | 63.5 | 1 | 63.5 |
| ATM Fees | 6.5 | 1 | 6.5 |
| | | | 75.95 |

**Child Care**

| | | | |
|---|---|---|---|
| Daycare | 240 | 2 | 480 |
| Bottle Liners | 5.96 | 2 | 11.92 |
| Daycare Snack/Drinks | 12.59 | 4 | 50.36 |
| Diapers/Pull-ups | 36.68 | 2 | 73.36 |
| Baby Wipes | 2.57 | 2 | 5.14 |
| Baby Powder | 3.38 | 1 | 3.38 |
| Infant Toothpaste | 2.94 | 1 | 2.94 |
| Child Toothpaste | 2.94 | 1 | 2.94 |
| Fluoride Mouth Rinse | 3.56 | 1 | 3.56 |
| Lotion | 4.93 | 1 | 4.93 |
| Baby Bath Soap | 4.93 | 1 | 4.93 |
| Shampoo | 1.48 | 2 | 2.96 |
| Detangler Spray | 2.47 | 1 | 2.47 |
| Medicated Shampoo | 8.43 | 1 | 8.43 |
| Cortisone cream | 8.27 | 1 | 8.27 |
| Soap | 1.97 | 1 | 1.97 |
| Band–Aids | 1.97 | 1 | 1.97 |
| Children's Tylenol | 4.68 | 1 | 4.68 |
| School Lunch | 1.75 | 20 | 35 |
| Whole Milk | 2.6 | 14 | 36.4 |
| Sylvan Learning Centers | 172 | 1 | 172 |
| Sylvan Learning Ctr Testing Fee | 12 | 1 | 12 |
| | | | 924.68 |

**Child Care (Infrequent Items)**

| | | |
|---|---|---|
| Ear plugs/Banclit (For Tubes in ears) | 30.41 1/yr | |
| Potty Training Chair | 18.99 1/yr | |
| Softball Fees | 55 1/yr | |
| Softball Equipment | 22 1/yr | |
| Shoes | 120 1/yr | |
| 4–H Books & Membership | 20 1/yr | |
| Haircuts (child) | 80 1/yr | |
| | 346.4 /12 mo | 28.87 |

**Auto Maintenance**

| | | | |
|---|---|---|---|
| Oil Changes | | 28.7 8/yr | 229.6 |
| Repairs | Dec–03 | 1184.6 1/yr | 1184.6 |
| | Jan–04 | 53.9 1/yr | 53.9 |
| | Jan–04 | 202.64 1/yr | 202.64 |
| | Feb–04 | 1484.51 1/yr | 1484.51 |
| | Mar–04 | 810.83 1/yr | 810.83 |
| | | | 3736.48  /12mo  $311.37 |

**Transportation Cost** — Total 1860.8

| | |
|---|---|
| Gasoline Costs Jan 2004 | $252.90 per mo |
| Gasoline Costs May 2004 | $304.11 per mo |

see attached checking register

**Cell Phone Use for Job**  $ 55.50 of bill is job related use see attached bills

**Continuing Education Cost**  $ 10.00 per credit 50 credits needed per year   $500.00
Annual Conference Meeting Cost Attached

| | |
|---|---|
| OAPA Membership | $120/yr |
| AAPA Membership | $225/yr |
| ASCP Membership | $ 80/yr |
| NCCPA CME Logging Fee | $ 90/yr |
| NCCPA CME Internet | $ 95/yr |

**Insurance Premiums**

| | |
|---|---|
| Life Insurance (AFLAC) $50,000 | $25.00 per mo |
| Short Term Disability Insurance | $80.00 per mo |

**Recreation Expenses**

| | |
|---|---|
| Zoo Membership | $60/yr |
| WineMakers Magazine Subscription | $26/yr |
| Brew Your Own Magazine | $26/yr |
| ZooBooks Subscription | $20/yr |
| Hobbies | $25/mo |