**In re Edward and Janet Claire SNOW, Debtors.**

**Bankruptcy No. 95–11570–WCH.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 16, 1995.

---

Jacqueline F. Walsh, U.S. Dept. of Justice, Boston, MA, for U.S. Trustee.

James J. Gavigan, Quincy, MA, for debtors.

*DECISION ON MOTION TO DISMISS*
*UNDER § 707(B)*

WILLIAM C. HILLMAN, Bankruptcy Judge.

The United States Trustee has moved to dismiss this matter pursuant to 11 U.S.C. § 707(b).[1] At hearing it appeared that all relevant facts were set forth in the record and were not disputed in any meaningful respect. I took the matter under advisement.

### Summary of Facts

Edward Snow ("Edward") and Janet Claire Snow ("Janet") (collectively "Debtors") filed their voluntary Chapter 7 petition on March 8, 1995.

The schedules to their petition listed unsecured consumer claims of $32,239.41, $7,003.16 in secured debt, and no unsecured priority claims. Schedules I and J as originally filed disclosed that the Debtors had monthly income in excess of current expenditures of $1,096.50. The schedules did not include any payment provisions for the secured debt.

The first meeting of creditors was scheduled for and was held on April 17, 1995. On that date Janet agreed to reaffirm a secured debt to Sears, Roebuck and Co. in the amount of $3,249.77 and agreed to make payments of $78.00 per month on that account. The records of this case do not disclose that Edward signed a separate reaffirmation agreement, but on April 26, 1995, Debtors moved to amend Schedule J to include the $78.00 payment by Janet and an additional $92.00 payment by Edward. The effect was to increase monthly expenditures to $1,548.50. The motion was granted.

On May 16, 1995, Debtors again moved to amend Schedule J, increasing stated monthly expenses to $1,752.50. The basis for the motion was that Debtors

"have kept an accurate account of general monthly expenditures over the last thirty (30) days. The monthly expenses are greater than originally estimated."

Comparison of the original and second amended schedules shows that the major increases were in utility payments, food and clothing expenditures, and the additional of a $40.00 monthly item for auto maintenance. The second motion to amend was also granted.

If the amounts in Schedule I and J *as originally amended* should prove to be accurate, Debtors' monthly income of $2,475.00, less expenses of $1,548.50, would leave $926.50 per month in excess income. A three year plan with that monthly payment would provide $33,354.00 to be distributed, which is in excess of the total $32,239 indebtedness. A three-year Chapter 13 plan paying creditors 100% would be possible.

Using the *second amended* Schedule J, which I must regard as Debtors' most determined effort to reduce the amount of excess income, the monthly excess income is $722.50. Over three years that amount would yield $26,010, or 81% of the total indebtedness. A forty-five month plan would result in a 100% payment.

The United States Trustee's motion was timely filed within 60 days of the § 341 meeting date. Fed.R.Bankr.P. 1017(e)(1). In their opposition to the motion, Debtors noted that they anticipate additional expenses within the next two years when one child enters college.

### Discussion

The Bankruptcy Amendments and Federal Judgeship Act of 1984[2] added a variety of provisions to Title 11, including § 707(b). It was one of a collection of new provisions imposing constraints on consumer bankruptcies.[3] The meaning of the section is not

---

1. "After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There

shall be a presumption in favor of granting the relief requested by the debtor."

2. Pub.L. No. 98–353, 98 Stat. 333.

3. *See, e.g.,* §§ 342(b), 523(a)(2)(C), 523(a)(9), 521(1), 1325(b), 1329(a). For a summary of the legislative history, *see* David L. Balser, *Section*

manifest. I agree with Judge Yacos that in this instance there can be no resort to legislative history for assistance because

"there simply is no legislative history in the ordinary sense as to the crucial language added and deleted in the final bill that emerged out of a conference committee with no separate conference analysis report."

*In re Keniston,* 85 B.R. 202, 214–215 (Bankr. D.N.H.1988). *See also Green v. Staples (In re Green),* 934 F.2d 568, 570–571 (4th Cir. 1991).

Whether or not relying on legislative history, the cases have embraced a variety of approaches in their search for the meaning of § 707(b).

■ *Keniston* is the only relevant decision on this issue in the First Circuit. Judge Yacos examined the question with great care, concentrating on the constitutionality of the statute, and reasoned that if the measure of "substantial abuse" is related to ability to repay, there would be a serious constitutional problem under the Equal Protection Clause. 85 B.R. at 213. He concluded that

"the dismissal power under § 707(b) is not essentially different from the established power of a bankruptcy court to dismiss a petition under any chapter of the Bankruptcy Code that is filed with a lack of good faith or an as abuse of the process under §§ 105(a) and 707(a) of the Code."

*Id.* at 223.

I respectfully disagree. If § 707(b) is as limited as *Keniston* concludes, it would be completely unnecessary. While the intent of Congress is lost in the darkness of conference committee deliberations, it is fair to assume that Congress intended to accomplish *something* when it enacted the provision. The section is more than a needless duplication of other provisions of the Code that have always required petitioners to file in good

faith. *In re Walton,* 866 F.2d 981, 983 (8th Cir.1989).

I agree generally with Judge Abram's view of the intent of the language of the 1984 amendment:

"In this court's view, Congress intended the courts to apply Code § 707(b) as a type of motion to dismiss for failure to state a claim for relief. It is to be used to deny Chapter 7 relief to those persons whose pleadings in the form of the petition, schedules, statement of affairs and statement of income and expenses fail to reflect a need for the relief being sought because they do not reflect that the debtor is now suffering or will suffer in the near future from any meaningful economic hardship. The 'substantial abuse' provision is in the nature of a threshold predicate to entitlement to Chapter 7 relief." [4]

*In re Edwards,* 50 B.R. 933, 936 (Bankr. S.D.N.Y.1985).

There would be no need for § 707(b) if it were directed only to traditional notions of bad faith. The Bankruptcy Courts have had little difficulty in dismissing cases deemed to be filed in violation of those standards:

"Courts have denied relief for (1) successive filings; (2) failure to supply financial data; (3) lack of compliance with court orders; (4) protection of preferences; (5) fraudulent transfers; (6) concealment of assets; (7) filing for ulterior motives such as delay, avoidance of contractual obligations, or reclamation of assets; (8) failure to list truthfully all obligations and monthly expenses; and (9) for seeking to maintain an exorbitant lifestyle at creditors' expense."

Balser at 1028 (footnotes omitted).

Ability to pay was not considered a ground for dismissal under § 707(a).[5] The legislative history makes the intention explicit:

---

707(b) of the Bankruptcy Code: A Roadmap With a Proposed Standard for Defining Substantial Abuse, 19 U.Mich.J.L.Ref. 1011 (1986) ("Balser" hereafter).

**4.** Strictly speaking, the financial status of the debtor "in the near future" is not reflected in the petition and schedules. I deal with this problem below.

**5.** "The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees and charges required under chapter 123 of title 28; and

"The section does not contemplate ... that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy."

S.Rep. 95–989, 95th Cong., 2d Sess. 94 (1978).

■ Further support for this interpretation of § 707(b) can be found in the 1994 amendments to § 521(1) which require the filing of "a schedule of current income and current expenditures" as part of the debtor's duties.[6] Unless those additional schedules serve some purpose, there was no need for the mandate. No utility beyond assisting an income-based determination under § 707(b) comes to mind. I hold that the debtor's ability to make substantial payments on unsecured indebtedness sought to be discharged in the Chapter 7 case is to be considered by the court in making its findings under § 707(b). The decisions are divided as to the weight to be afforded that determination. Is ability to pay in itself sufficient grounds for dismissal?

■ The first relevant opinion by a court of appeals appears to be *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988). The court adopted what it described as

"the rule adopted by the overwhelming majority of the courts considering the issue ... that a debtor's ability to pay his debts will, standing alone, justify a section 707(b) dismissal."

841 F.2d at 914.[7]

The Eighth Circuit has adopted the *Kelly* approach. *In re Walton*, 866 F.2d 981 (8th Cir.1989). *See also United States Trustee v. Harris*, 960 F.2d 74 (8th Cir.1992).

The Sixth Circuit Court of Appeals has taken a broader approach:

"Those courts which have reviewed the legislative history, have generally concluded that, in seeking to curb 'substantial abuse,' Congress meant to deny Chapter 7 relief to the dishonest or non-needy debtor. In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. *Substantial abuse can be predicated upon either lack of honesty or want of need.*

. . . .

"Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone *may* be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worth of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other facts relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities."

*In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989) (citations omitted; emphasis added).

*Kelly* can be read to mandate dismissal given sufficient ability to pay. *Krohn* permits but does not require that result.

The Fourth Circuit expressly rejected the absolute rule of *Kelly*. *Green, supra* at 572.

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee."

**6.** Pub.L. 98–353, § 305(2).

**7.** The court also recognized that bad faith could warrant a § 707(b) dismissal. 841 F.2d at 915. Since, however, there is no contention by the United States Trustee thus far that the Debtors in this case are other than completely honest, I need not consider that point further at this time.

Instead, it adopted the "totality of the circumstances" approach, which, it said

"Involves an evaluation of factors such as the following:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith."

*Id.*

There are many other decisions from the district and bankruptcy courts, but a review indicates that most can be reconciled with one or more of the circuit court decisions described above.

On balance, I find the application of *Kelly'*s absolute rule to be an unreasonable reading of "substantial abuse". Although there is predictability in a *per se* rule, it is obtained at the expense of fairness and perhaps even of basic principles of due process. *In re Galvao*, 183 B.R. 23, 26 (Bankr.D.Mass.1995). There is no need to select between the other views, for they may be collectively summarized as requiring an analysis of the facts and circumstances of the individual case.

At the hearing the parties were most concerned about the effect of a *per se* determination; neither the pleadings nor the evidence adduced through uncontradicted statements of counsel is sufficient to lead to a determination of this motion under the view of the law adopted in this decision. It will be necessary to conduct an evidentiary hearing, or for the parties to agree as to additional facts, before I can do so. Since this is a new and unsettled area of the law, some guidance on procedural aspects of the further proceedings may be useful.

■ "There is a presumption in favor of granting the relief requested by the debtor." § 707(b) (last sentence).

"[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

Fed.R.Evid. 301.

Judge Russell has observed that it is difficult to predict how Rule 301 will play out in § 707(b) litigation. Barry Russell, *Bankruptcy Evidence Manual* § 301.7 (1994–95 ed.) ("Russell"). The statutory presumption is not conclusive and may be rebutted. *In re Dubberke*, 119 B.R. 677 (Bankr.S.D.Iowa 1990).

The First Circuit Court of Appeals has discussed presumptions in several cases. Dealing with United States Treasury regulations, it held that a rebuttable presumption prevails "until the party disputing the presumed fact offers *substantial countervailing evidence.*" *Zelman v. Gregg*, 16 F.3d 445, 447 (1st Cir.1994) (emphasis added). Regarding the presumption of a continuing domicile, it held that the opponent has "the ultimate burden of persuasion ... to prove by 'competent proof' and by a 'preponderance of the evidence' " that domicile had not continued. *Bank One v. Montle*, 964 F.2d 48, 51 (1st Cir.1992). In a labor law context, it held that the opponent of the presumed fact "has no more than the limited duty of producing evidence to balance, not to outweigh" the presumption. *National Labor Relations Board v. Wright Line*, 662 F.2d 899, 905 (1st Cir.1981). In all three instances Rule 301 was cited. I need not completely reconcile the cases on the facts before me.

In the special context of § 707(b), we have what has been called a "strong presumption". *In re Farrell*, 150 B.R. 116 (Bankr.D.N.J. 1992). The debtor's schedules, executed under the pains and penalties of perjury, have significant evidentiary weight.

■ While there are certainly other means of demonstrating substantial abuse, I

hold that if the schedules indicate a debtor's ability to make *very substantial* payments on unsecured indebtedness, the movant has met the initial burden. The presumption then "vanishes entirely ... and the question must be decided as any ordinary question of fact." *Bank One* at 51 n. 2; Russell § 301.3.

■ The playing field is now even, and the debtor has the burden of producing evidence to demonstrate entitlement to relief. In so doing, all of the various factors recited by the circuit courts as quoted above should be considered.

In the context of the present case, and as an aid to the parties in moving toward a determination of this motion, I find that proof of the ability to pay 81% of unsecured indebtedness in three years would be adequate to rebut the presumption.[8] Of course, the schedules are merely a snapshot of financial status at the time of filing. It may be that extrapolation from them creates a false impression, but it is for the Debtors to come forward with the necessary proof in that regard.

A pre-hearing conference will be noticed in ordinary course.

---

8. "[T]he courts appear to have granted motions to dismiss under 707(b) where the evidence showed Debtor could pay 75 to 100% of the unsecured claims over a period of 3 to 5 years." *In re Lee,* 162 B.R. 31, 37 (Bankr.N.D.Ga.1993).