**In re James E. GOTHAM, III and Susan Shore Gotham, Debtors.**

**No. 03–16803–WCH.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

June 27, 2005.

Gary W. Cruickshank, Law Office of Gary W. Cruickshank, Boston, MA, for Debtors.

Gary L. Donahue, Boston, MA, U.S. Trustee.

### DECISION REGARDING MOTION TO DISMISS CASE

WILLIAM C. HILLMAN, Bankruptcy Judge.

I. *Introduction*

The United States Trustee (the "Trustee") moved to dismiss the case of James

E. Gotham, III ("Mr. Gotham") and Susan Shore Gotham ("Mrs. Gotham", collectively "the Debtors") under 11 U.S.C. § 707(b)[1] (the "Motion") on the grounds that such action is warranted after an application of the totality of circumstances test. According to the Trustee, the Debtors' petition contained numerous inaccuracies and, when properly revised, will reflect that they could have proceeded under Chapter 13. The Debtors objected to the requested dismissal arguing that a review of their circumstances will reveal that they are both honest and needy. For the reasons set forth below, I will enter an order denying the Motion. The following constitute my findings of fact and conclusions of law.

## II. Background

### A. General Background of the Debtors

The Debtors met in August of 2000. At that time, Mrs. Gotham lived and worked in Pennsylvania. She held two jobs which utilized her recently obtained graduate degree in social work. Since 1984, Mr. Gotham had operated his family's seasonal restaurant and gift shop on Cape Cod. He received a reduced salary in exchange for housing and the promise that he could buy the family business at a reduced price. The sale was to occur shortly after the Debtors met. During the off-season, Mr. Gotham worked for a local contractor.

After they met, the Debtors traveled between Pennsylvania and Massachusetts and took trips to locations such as Thailand and Florida. In November of 2001, they were engaged. Although they incurred debt during that period, they contend that until May of 2002, their prospects for their financial future were bright given Mrs. Gotham's growing therapy practice and Mr. Gotham's future with the family business.

In May of 2002, Mr. Gotham's father reneged on the agreement to sell Mr. Gotham the family business at the agreed price and instead listed the property for sale. Mr. Gotham had to leave the house he had occupied and refurbished, rent and furnish an apartment and search for new employment. Despite this set back, the Gothams proceeded with their June wedding plans.

During the summer of 2002, Mr. Gotham lived on Cape Cod but encountered very little work. He was behind on his credit cards, lost his condominium in Florida to foreclosure and his car was repossessed. Mrs. Gotham remained in Pennsylvania but moved to the Cape at the end of the summer. She stated that she sold many of her belongings before moving and sold what she had left after she arrived at the Cape due to their cash flow restrictions.

The Debtors contend that by September of 2002, they decided that Mr. Gotham should seek bankruptcy relief. Mrs. Gotham testified that she had made no such decisions even though her some of her credit cards were then in arrears. Although they met with their bankruptcy counsel that fall, they did not proceed with the filing due to their lack of funds. Mrs. Gotham was not able to obtain employment until the spring of 2003 and was not able to transfer her psychotherapy privileges from Pennsylvania to Massachusetts for one year after her move. Mrs. Gotham explained in the affidavit she served on the

---

1. That section provides that a court may dismiss a case "filed by an individual debtor under this chapter whose debts are primarily consumer debts if [the court] finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor." 11 U.S.C. § 707(b).

Trustee that she did not decide to file until the late spring of 2003.

### B. *The Bankruptcy Petition*

The Debtors eventually filed a petition for relief under Chapter 7 on August 13, 2003 (the "Petition"). They signed the Petition under the pains and penalties of perjury on July 14, 2003.[2] At that time, Mr. and Mrs. Gotham were 48 and 53 years old respectively.

On Schedule A, the Debtors listed no real property. On Schedule B, they disclosed personal property with a value of $15,176 and claimed exemptions in Schedule C in a like amount. The Debtors later amended Schedules B and C to include $250 worth of U.S. Savings Bonds which Mrs. Gotham owns jointly with her brother. They listed no creditors on Schedule D and $12,332 in priority unsecured debt on Schedule E.

In a prefatory page to Schedule F, they asserted that the credit card debt was incurred from September 2000 through June of 2002 which corresponds with the time period between when they met until when they got married. The debts in this schedule include $31,524 on four different accounts to American Express, $22,875 on three different accounts to Citibank, $14,981 to First USA Bank, and $48,263 on three different accounts to MBNA. The Debtors later amended Schedule F to include Mrs. Gotham's two student loan creditors. The total amount of unsecured non-priority debt, including the student loans, is $199,579.62.

In Schedule I, Mr. Gotham listed his occupation as a construction worker and disclosed that he had been employed by a company for eight months prior to the Petition Date. Mr. Gotham testified that he augmented his salary by performing side jobs. Mrs. Gotham disclosed that she was an outreach therapist but did not list her length of employment. The Debtors listed a total combined monthly income of $3,958.78.

In Schedule J, they disclosed monthly expenses of $4,999. Those expenses included $450 for fuel and electricity, $600 for food and $200 for medical and dental expenses. They claimed $253 for transportation expenses and $522 for monthly car expenses. The Debtors listed rent at $2,000, legal fees at $88 and $75 for supporting Mrs. Gotham's mentally ill brother. They disclosed that the expenses were their best estimate of their average monthly expense. In their Statement of Financial Affairs, the Debtors listed gross income in 2001 of $53,828 and in 2002 of $38,000.

### C. *The § 707(b) Motion and the Joint Pre-Trial Statement*

On April 15, 2004, the Trustee filed the Motion in which he urged dismissal based upon errors in the Petition. He also argued that a closer examination of the Debtors' Schedule I (monthly income) and Schedule J (monthly expenses) will reveal that the Debtors have sufficient excess income to support a Chapter 13 plan. That is, when taking into consideration their true monthly income as compared to the adjusted monthly expenses, the Debtors could potentially pay up to 75% of their unsecured claims.

Specifically, the Trustee explained that Schedule I should be adjusted to reflect that the Debtors' average monthly income

---

**2.** Mrs. Gotham's statement for June reflects that she paid her attorney $150 on June 12, 2003. The July statement contains no checks and there are no checks to counsel in August.

On September 30, 2003, Mrs. Gotham wrote a check for $50 to her counsel with the memo "Balance in Full".

based upon the record of their pre-petition bank deposits is $6,495.98, well in excess of their average monthly expenses. He further argued that the Debtors' Schedule J should be adjusted to reflect expenses accurately. For example, the Trustee explained that the amount of $2,000 for rent is not an average amount because the Debtors paid $2,000 per month during the summer months and $1,000 per month for the remainder of the year. He further argued that the expenses for electricity and fuel ($450.00), food ($600.00) and legal fees ($88.00) are inaccurate.

In their response to the Motion, the Debtors indicated that they are moving and that their monthly rent will be set at $1,200. They explained that their monthly food expenses, which include household supplies, are high because discount shopping is not readily available on Cape Cod. They argued that the other contested expenses are accurate. They also responded that their monthly income is accurate and that anything above the listed average is either a result of a loan from a family member or an advance payment for construction work. The Debtors further defended the Motion on the basis that they do not have any insurance for health, dental or disability.

The parties filed a Joint Pre–Trial Statement ("JPTS") in which the Trustee reiterated his position. The Debtors explained that their income is sporadic based upon employment of a similar description. Mrs. Gotham described her lease of a luxury vehicle as the only means by which she could drive a car. The Debtors stated that they do not lead an extravagant lifestyle and that they cannot propose a feasible Chapter 13 plan.

In the JPTS, the parties agreed to certain facts. Mrs. Gotham received an inheritance of $232,000 between 1998 and 2000 and spent that amount by 2000 on the payment of bills and consumer goods.[3] Mrs. Gotham's father gave the Debtors $10,800 between January 2003 and September 2003. Mrs. Gotham purchased several luxury items directly before and after the Petition Date.

In the disputed facts section of the JPTS, the Trustee questions whether the Debtors were truthful about their monthly rental expense and when they incurred the credit card debt. He also claimed that the monthly income was incorrect as were the expenses for food, fuel and electricity.[4] Lastly, the Trustee contends that the Petition was incorrect because it did not list a friend of Mrs. Gotham as a creditor despite the fact that Mrs. Gotham wrote her monthly checks before and after the bankruptcy.

### D. The Evidentiary Hearing

At the start of the Evidentiary Hearing (the "Hearing"), the Trustee argued that he should prevail on the Motion because he would be able to establish both want of need and lack of honesty on the part of the Debtors. The Debtors responded that, in fact, they would establish that their expenses are and will be much higher than their income and that any indicium of lack of honesty was inadvertent.

When Mrs. Gotham testified, she explained that she holds a Bachelor's Degree and a Master's Degree in Social Work. She is a licensed social worker in Massachusetts and Pennsylvania and holds a license

**3.** This fact was not addressed at the Hearing, defined below.

**4.** The Trustee suggests in the JPTS that the average expenditures during the high rate months was $18 higher than was the Debtors listed.

to sell real estate in Pennsylvania but not in Massachusetts.

Mrs. Gotham testified that while her husband contemplated filing for bankruptcy as early as the fall of 2002, she did not consider the same until late spring of 2003.[5] She agreed that she had stopped making payments to MBNA and Citibank by February of 2002. She explained that until the late spring of 2003, she had held out hope that she would be able to salvage her credit. She also explained that she had tried to negotiate with these two creditors but found that she could not afford the large payments they had requested. She had tried for a time to get by with loans from family members.

With respect to her employment at the time of the Hearing, she stated that she is a therapist and has only a few clients and does volunteer work for the Alliance For the Mentally Ill. She explained that when she first moved to Cape Cod, she had hoped to work with her husband in his family business and build her own therapy practice. She stated that it has been very difficult to build such a practice. She said that she has tried to look for other employment by looking through the Yellow Pages and making contacts. She went to the Department of Mental Health and procured employment but that the positions did not last for reasons such as lack of funding. She explained that her two attempts to obtain a retail position were rejected because she had disclosed that she wanted concurrently to develop her therapy practice. She has not looked for other retail positions or attempted to obtain a Massachusetts real estate license but alluded that she might attempt the latter.

Mrs. Gotham explained that she and her husband did not cause the Petition to be filed until one month after the Debtors signed the Petition in order that they could raise the funds to file the petition. She also explained that there was much to consider at the time they filed it out and that in retrospect she would have changed some items. She stated that she was not under pressure when she signed the Petition.

With respect to Schedule I, she stated that she and her husband arrived at the figure for his income based upon his full time job and the fact that he was beginning to work side jobs. Regarding Schedule J, she agreed that the figure they used for monthly rent did not reflect their average monthly rent rather it reflected their rent for the high season on Cape Cod, the time when they filed the Petition. Their rent at the time of the Hearing was $1,200 and she explained that there were no seasonal increases in the rent for this apartment which they moved into after the Petition. With respect to the expenses for heat and fuel, Mrs. Gotham represented that the costs were high in the apartment they lived in at the time of filing. Her amended Schedule J, described below, indicates that they now spend an average of $275 on that monthly expense.

One item which Mrs. Gotham explained is not on Schedule J but should be included is health and dental insurance. She stated that the Debtors have not had health insurance since June of 2002. After researching the costs of such insurance, she concluded it would cost them between $900 and $1,250 per month. She is quite concerned that they do not have this cov-

---

5. There was some debate during the Hearing about whether she had decided to file in the late spring on early summer. The difference between the two time periods is largely irrelevant and I don't find her equivocation as to the time period an indication of a significant falsehood.

erage. She needs extensive dental work including implants and work on her jaw.

With respect to her student loans, Mrs. Gotham testified that she had not added them originally because she had understood from the debt advisor with whom she met in May of 2003 that she need not list them as they were nondischargeable debts. With respect to the statement in her petition that she had not taken a cash advance within one year of filing, she has subsequently concluded that she may have taken a small cash advance during that time so to that extent, the Petition was not correct.

Mrs. Gotham agreed at trial that in the Petition she prefaced Schedule F with the statement that she had incurred the listed credit card debt from September 2000 through June of 2002. She then acknowledged that Trustee's Exhibits 7 through 10 reflect that between November of 2002 and March 2003, she charged to her Saks Fifth Avenue account approximately $700 for cosmetics, $600 for clothes and $200 for a pair of shoes. Her total debt to Saks Fifth Avenue in the Petition was $6,000.69. She also acknowledged that Trustee's exhibits 11 and 12 reflect that in December of 2002, she charged to Bloomingdales, *inter alia*, $366 on a pair of shoes and in June of 2003, $552 on luxury linens and $258 on bath accessories. These charges were made when she and her husband were in financial difficulty, indeed she incurred the June Bloomingdales charge when she was actively considering bankruptcy.

She explained at the Hearing that at that time she was hoping for a loan from her father's business partner. She agreed that during her deposition she did not describe this hoped for loan. She offered that she has always been interested in fashion given that her mother owned a retail store. She stated that she purchased many of the listed items at a deep discount and that many items were necessary given that she has occasional speaking engagements and needs clothes to fit in with the diverse clientele she sees on the Cape.

Mrs. Gotham addressed her monthly lease of a luxury automobile. She explained that she began the lease in June of 1999 when she lived in Pennsylvania and was employed full time and could make the payments comfortably. She could also make her other payments at that time. After moving to the Cape and prior to filing the Petition, she testified, the Debtors went to several dealerships to purchase a car. They paid $100 to Hyannis Ford for a service whereby the dealership would find someone to sell them a car. They were rejected on the grounds of credit and refunded the money. They had the same results from three other dealerships.

Mrs. Gotham explained that when the lease on her car was at its end and after the BMW dealership close to her home rejected her overtures, she went to an off-Cape dealership. That dealership agreed to another lease due to Mrs. Gotham's long time relationship with the company. She agreed with the Trustee that she should have a less expensive car but explained that this was her only hope and she needs a car in order to meet her job commitments. She stated that the payments totaling $6,480 she made in the 60 days prior to filing could have gone to the purchase of a car but she had to make payments to her attorney, her student loans and another creditor. She offered that she would gladly give the car up.

With respect to the omitted creditor, Anselma King, Mrs. Gotham explained that she is comparable to a mother. Mrs. Gotham stated that there is no written agreement between the two and that the occasional loans are casual arrangements.

She did not think she had to list such a good friend.

When Mr. Gotham testified, he explained that he is a carpenter who is presently self-employed. He has a high school degree and attended two years of college. For many years he worked for the family business, a gift shop and restaurant. He explained that it took him almost a year to file for relief because it took him that long to raise the monies for a retainer. He stated that his business is not doing well.

### E. The Bank Accounts

The Trustee introduced into evidence the Debtors' bank statements for the months leading up to the Petition and the subsequent months. The parties agreed that between January of 2003 and September of 2003, Mrs. Gotham's father sent checks to the Debtors in the total amount of $10,800.

Mrs. Gotham's Cape Cod Bank & Trust bank account from January 3, 2003 through February 5, 2003 reflects that she deposited $6,852 and withdrew $6,829.92.[6] Part of the deposit was from a check from her father in the amount of $1,500. Some of the checks listed in the account are not contained in the exhibit. Many of the checks attached to the statement appear to be for reasonable purchases such as food (totaling approximately $236), gas for heating ($295) and dry cleaning ($85.10). Between the statement and the checks, there is also evidence that she made payments to certain creditors such as American Express ($213), the Trustees of the University of Pennsylvania ($154.87), Khouris (101.85) and Anselma King ($100). Her

Saks Fifth Avenue bill for January of 2003, reflects that during that month Mrs. Gotham made a payment in the amount of $279[7] and spent $673.52 principally for clothing.

In February, Mrs. Gotham deposited $5,290, $500 of which was from her father, and spent $5,443. She paid Saks Fifth Avenue $318 and charged $206 for a pair of shoes. She spent $344 on food and paid certain creditors such as American Express ($230), Khouri ($68.25) and the University of Pennsylvania ($154.62). She also bought theater tickets for $213. Not all of the checks listed in the statement were attached to the statement.

In March, the bank statement reflects that she deposited $4,352.50 and withdrew $4,619.41. She paid American Express ($229), the University of Pennsylvania ($154.37) and BMW Visa ($132). She spent approximately $921 on heating and electricity. She made her first payment to bankruptcy counsel for $150 with the notation that the balance was $850. She made a payment of $304 to Saks Fifth Avenue and purchased cosmetics in the amount of $326.56.

In April, her deposits totaled $6,245.44 and her withdrawals totaled $5,313.06. Approximately $1,000 of the deposits came from her father. The withdrawals were for, inter alia, food ($380) and payment of creditors such as Saks Fifth Avenue ($311), Bloomingdales ($144), BMW Visa ($132) and American Express ($1433.98). The Debtors also spent $200 on electricity.

In May of 2003, the bank account reflects $10,921 in deposits and $11,437 in withdrawals. At least $2,300 came from

6. Mrs. Gotham testified that during the time she held this bank account, she was the only one of the couple whose name was on the account and that the couple had no other bank account.

7. The statement from February 2003 reflects this payment as does the summary of checks from Mrs. Gotham's bank account. The check itself was not included in Trustee's exhibit 13.

Mrs. Gotham's father. The Debtors wrote a check for $4,100 for a deposit on an apartment which included payment of the first and last months rent. In addition to payments for food ($307) and electricity and heating ($307), Mrs. Gotham paid Filene's ($147), American Express on two accounts ($2,108), Saks Fifth Avenue ($301), Bloomingdales ($200) and BMW Visa ($133).

In June of 2003, the total credits on the bank account were $11,123.57 and the total debits were $10,748. Mrs. Gotham's father contributed $5,000 of the deposits and $2,732 came from a return of the rental deposit from May. With respect to payments, the Debtors spent $2,700 for a rental deposit on another apartment. According to the memo line on a few checks, they spent approximately $3,000 on a van for Mr. Gotham. They also paid Hyannis Ford $100 as a deposit. They made a few payments to creditors. In June, Mrs. Gotham spent $877.57 on luxury linens and bath accessories at Bloomingdales.

In July of 2003, Mrs. Gotham deposited $6,837 and withdrew $6,659. This statement was missing the first page and had no corresponding checks. In August of 2003, Mrs. Gotham deposited $5,176 and withdrew $5,575. She spent $658 for food, $78 for work clothes and $156 for a sweater.

In September of 2003, she deposited $6,642 and withdrew $6,686. Some of this was from Mr. Gotham's work outside of his job and at least $2,300 constituted deposits for jobs he was to perform. Of the checks, one represented a final check to their bankruptcy counsel which is consistent with the incremental payments they had been making. Also in September, Mrs. Gotham spent $567 on clothing and shoes for work.

In October of 2003, Mrs. Gotham deposited $6,674 and withdrew $6,212. Over half of the deposited funds came from Mr. Gotham's outside jobs. The money was spent on food, work supplies for Mr. Gotham and items such as a handbag ($241) for Mrs. Gotham. She also spent $160 on bedding and $1000 for a retainer for tax counsel for her husband.

In November of 2003, Mrs. Gotham deposited $6,680 and withdrew $5,613. The deposits included a $1,500 loan from a new employer. The withdrawals included much of the same bill payments such as for food and the car rental. The payments to women's clothing stores totaled approximately $937. Mrs. Gotham also wrote a check to "Penn Alumni" for $187 with a notation in the memo section that indicated the purchase was for a lamp.

In December of 2003, Mrs. Gotham deposited $4,353 and withdrew $6,044. There were no checks attached to the exhibit. In January of 2004, Mrs. Gotham deposited $5,654 and withdrew $5,575. There were no checks attached. In February, she deposited $4,460 and withdrew $4,706. There were no checks attached. In March she deposited $4,526 and withdrew $3,429. In April, she deposited $7,782 and withdrew $8,123. One deposit of $2,000 was a gift. In May, Mrs. Gotham deposited $1,858 and withdrew $2,473. At that point the Debtors had opened separate accounts at different banks.

The Trustee's Exhibit 14 contains the bank statements from Mrs. Gotham's account at Banknorth. Her October 2004 account reflects a balance of $1,784, a deposit of $4,424 and a withdrawal of $4,719. The checks were for food, dental, telephone and the like. Her November and December statements are quite comparable. In Debtors' Exhibit 6, Mrs. Gotham included her bank statement for January 2005 through February 2005. During that

time she had a balance of $1,403, deposited $3,666 and withdrew $4,955.

The Trustee's Exhibit 15 contains statements from Mr. Gotham's account with Citizen's Bank.[8] From September 18, 2004 until October 19, 2004, he deposited $18,932 and withdrew $13,284. The ATM withdrawals reflect payment for items such as gas and convenience store food purchases. The checks for that month, found in Debtors' Exhibit 5, reflect work related payments and payments to his wife. The next statement is from November 18 through December 16, 2004. That statement reflects deposits of $9,161 and withdrawals of $9,301. The ATM withdrawals are mostly for food and the checks were largely for work and his wife. In Debtors' Exhibit 5, the January to February 2005 statement reflects deposits of $3,802 and withdrawals of $3,663. The ATM withdrawals are mostly for food and the checks appear to be work related. The February to March statement reflects deposits of $2,603 and withdrawals of $3,728

### F. *The Tax Returns*

The Debtors file individual tax returns. For 2002, Mrs. Gotham's total income was $5,909 and her taxable income was $0.00. For that year, Mr. Gotham earned $28,779 and his taxable income was $20,179. In 2003, Mrs. Gotham earned $5,732 and her taxable income was $0.00. Mr. Gotham earned $24,214 and his taxable income was $15,028. In 2004, her income was $3,620 and her taxable income was $0.00. In 2004, his total income was $50,866 and his taxable income was $41,361

### G. *Other Information.*

Attached as Debtors' Exhibit 4, the Debtors provided an Affidavit of Debtors to Supplement Amended Schedule J. Attached to that was an amended Schedule J which they did not file but which they provided to the Trustee in October of 2004 in order to update the Trustee on the Debtors' monthly expenses since the filing. Consistent with their unrebutted testimony at trial, the Debtors represented in the affidavit that they did not list as an expense health insurance which they presently do not have. Were they to procure such insurance, it would cost them between $800 and $1,200 per month. Further, Mr. Gotham represented that for his work he requires liability insurance which will cost him between $50 and $125 per month. Mr. Gotham explained that he does not know how he will pay the priority tax claim but such repayments would have an impact on his monthly expenses. He also disclosed that he has been diagnosed with Flammitory Arthritis which may have an adverse impact on his ability to work.

In the Amended Schedule J, the Debtors listed their rental payments at $1,200 and electricity and heating fuel expenses at $275. They also listed $640 for food, $218 for clothing and $367 for student loan repayments. They also disclosed monthly payments of $246 per month for legal fees and $160 for the cared of Mrs. Gotham's sick brother. The total for their expenses was $5,854.

### III. *Discussion*

#### A. *Burden of Proof*

■ I addressed the issue of the burden of proof with respect to a § 707(b) motion in *In re Snow*, 185 B.R. 397 (Bankr. D.Mass.1995). After recognizing that the statute itself contains a presumption in

---

**8.** The account is a Business Partners Checking account in the name of James E. Gotham III d/b/a Jim's Home Repair.

favor of the debtor, *id.* at 402, I cited the following rule of evidence:

> A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

*Id.* (citing Fed. R. Ev. 301).

■ I went on to comment as follows

> In the special context of § 707(b), we have what has been called a 'strong presumption'. *In re Farrell,* 150 B.R. 116 (Bankr.D.N.J.1992). The debtor's schedules, executed under the pains and penalties of perjury, have significant evidentiary weight.
>
> While there are certainly other means of demonstrating substantial abuse, I hold that if the schedules indicate a debtor's ability to make very substantial payments on unsecured indebtedness, the movant has met the initial burden. The presumption then 'vanishes entirely ... and the question must be decided as any ordinary question of fact.' [citation omitted]

185 B.R. at 402.

### B. *The First Circuit Test for 11 U.S.C. § 707(b)*

■ The First Circuit has addressed the standard for reviewing the Motion. *See First USA v. Lamanna,* 153 F.3d 1 (1st Cir.1998). In that case, the court adopted the totality of circumstances test set forth in *In re Krohn,* 886 F.2d 123, 125–26 (6th Cir.1989). *Id.* at 5. The *Krohn* court articulated the test as follows:

> In determining whether to apply § 707(b) to an individual debtor, ... a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is 'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. Substantial abuse can be predicated upon either lack of honesty or want of need.
>
> .   .   .   .   .
>
> Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustments of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Krohn,* 886 F.2d at 126–27.[9]

■ After inserting this quote, the First Circuit cautioned that "in assessing the

---

9. I have consistently applied this method in deciding a § 707(b) motion. See e.g. *In re Snow,* 185 B.R. 397 (Bankr.D.Mass.1995)

totality of a debtor's circumstances, courts should regard the debtor's ability to repay out of future disposable income as the primary, but not necessarily conclusive, factor of 'substantial abuse.' The factors recited in Krohn should be regarded as a nonexclusive list of relevant considerations." *Id.*

In *Lamanna,* the debtor had the ability to pay all his debts under a Chapter 13 plan as his excess income was approximately $770 per month and his unsecured debt totaled $15,911.96. *Id.* His living situation was stable and it looked to remain the same in the future. After applying the totality of circumstances test, the First Circuit affirmed the dismissal under § 707(b). *Id.*

### C. *Applying the Factors*

#### 1. *Whether the Debtors Can Repay Their Debts Out of Future Income*

■ According to Amended Schedule F of the Petition, the Debtors have $199,579 in unsecured debt. At the time of the filing, they listed $3,958 for monthly income which is consistent with their tax returns but not with the deposit amounts at the time of filing. It is, however, consistent with their more recent bank accounts. Their revised Schedule J reflects monthly expenditures of $5,854.74 which reflects the Trustee's requested reduced amount of rent and heating charges. Were 1 to make deductions from the proposed amended Schedule J as requested in the Motion, I could reduce the expenses by $200 for food,[10] $246 for legal fees, $160 for care for brother and at lease $200 for car expenses. Thereafter, I would be left with a figure of $5,048 for expenses. This figure does not include, however, costs for

health insurance that would be considered a reasonable expense and which would add approximately $800 to the small amount listed for this charge in the revised Schedule J. The total for these expenses would exceed the average deposit amounts for Mrs. Gotham's account in the time period around the filing.

The prospect that the Debtors' fortune will change in the near future does not look hopeful. Mrs. Gotham remains without much work and she has little likelihood of finding a well-paying job commensurate with her educational background. Mr. Gotham has been able to make a living but does not appear to be prospering. In addition, his future employment in his chosen field is tempered by his recently diagnosed arthritis. Although Mrs. Gotham agreed with the Trustee at the Evidentiary Hearing that she could have afforded to pay her creditors $200 per month post-petition,[11] I agree with Mrs. Gotham that their ability to make such payments now is not feasible. Based upon these facts, I conclude that there is little hope that the Debtors can pay their debts out of their future income.

#### 2. *Stable Source of Future Income*

They are both largely self-employed. Mrs. Gotham has not been able to establish a practice after her relocation. Mr. Gotham has not been able to make much progress with his business after his termination from the family business. I conclude that the Debtors do not have a stable source of future income.

#### 3. *Eligible for Chapter 13*

The Debtors are eligible based upon their debt levels but given their tenuous employment, I am skeptical that Mrs. Got-

---

**10.** The Debtors accounts reflect that monthly they make several purchases in small increments at convenience stores.

**11.** An amount that would have yielded for her creditors less than 10% in a five year plan.

ham could qualify as a wage earner. Indeed, given Mr. Gotham's prospects, he too may have trouble in qualifying. At the present time, the plan they could propose would likely face opposition as their expenses exceed their income.

### 4. *Available State Remedies*

No such remedies were mentioned.

### 5. *Relief Available Through Private Negotiations.*

Mrs. Gotham explained that she tried to make repayment arrangements with some credit card holders but they would not negotiate. She also stated that she did make efforts to sell their assets. This is highlighted by the fact that this couple is in their mid-fifties and hold $15,000 worth of assets.[12]

### 6. *Whether Debtors Can Reduce Expenses Without Deprivation of Necessities*

In the months leading up to and after the Petition, Mrs. Gotham incurred expenses that were clearly extravagant and unnecessary. These included the luxury linens and the handbags. She testified that she is contrite about those purchases and can no longer afford the same. In their proposed amended Schedule J, the Debtors have set forth expenses for necessities which can be reduced as reflected in subsection 1. Even if I were to make these reductions, the expenses would exceed their income. Additionally, the Debtors have not included certain expenses that they could reasonably include in their proposed amended Schedule J such as for health and dental insurance. Such insur-

ance is relevant given the health and dental problems they described.

### 7. *Relationship with Creditors–Honorable and Undeceptive*

■ With regard to the honesty of the Debtors, I must look to the integrity of the Petition, whether the Debtors made any eve of bankruptcy purchases and whether the Debtors were forced into filing by unforseen events. *See In re McCormack,* 159 B.R. 491, 494 (Bankr.N.D.Ohio 1993) (citing *Krohn,* 886 F.2d at 126). I can also look at whether the Debtors took cash advances to pay other credit cards or make purchases in excess of their ability to repay. *In re Motaharnia,* 215 B.R. 63, 70 (Bankr.C.D.Cal.1997).

■ The Trustee did establish that there were issues with the integrity of the Petition. Three creditors were not listed. The two student loan creditors were subsequently added and I am satisfied with Mrs. Gotham's explanation as to why they were originally omitted. I am less persuaded as to why she chose to omit a creditor whom she described as a mother figure. The Trustee is also correct that some of the figures used for expenses were incorrect but I do not find that the errors were the result of a scheme to deceive the Court or creditors. The income that the Debtors listed did not represent an average of the amount listed in their monthly bank statements but those statements were also affected by gifts from relatives and an intermingling of business deposits and expenses which also were subject to fluctuation. The average income in the Petition was an accurate reflection of their tax return and

---

**12.** At the Hearing there was some discussion regarding whether Mrs. Gotham would sell her $4,000 diamond engagement ring. She explained that Mr. Gotham was quite opposed to such a sale. I agree with Mr. Gotham that

the failure to sell a highly sentimental exempt asset that would potentially yield payment on 2% of their debt does not reflect poorly on the Debtors with respect to the Motion.

indeed of their present financial circumstances.

Paramount to the integrity of the Bankruptcy Code is full and honest disclosure in a petition for relief. Whether it is necessary to list a creditor or accurately assess an expense does not rest with the discretion of a debtor. The Debtors in this case did not use their best efforts to ensure the complete accuracy of the Petition. While I am not impressed with the Debtors' integrity with respect to the final product, I cannot conclude that it was the result of deception and was detrimental to the creditors. Indeed, the Debtors appear to have been forthcoming since their filing.

The unsecured debt which the Debtors listed was not the result of the eve of bankruptcy purchases but largely was incurred during the two years after the Debtors met and were married. During this time, their prospects for future financial stability were strong. Mrs. Gotham did make certain consumer purchases at a time when she knew she was in financial trouble and for unnecessary luxury items. She explained that she made the purchases in order to furnish their apartments and to dress herself in a professional manner. These purchases, while financially careless, constitute a small fraction of the overall debt.

The Debtors were not forced into bankruptcy based upon a sudden unforseen event. The events that led them to filing, however, were unanticipated. When they began to incur this debt, they both were experiencing a bright future with income and assets. Indeed, Mr. Gotham was about to take over the family business, held a retirement account, owned a condominium and had his debts under control. Mrs. Gotham had finished her graduate degree, was beginning a practice and had a tidy inheritance presumably to help cover her expenses. They began to spend money but felt confident they could repay it. They then lost their jobs and could not recover. They lost their housing and health insurance. They began to sell their assets or lose them to foreclosure. Over a short period of time, they lost their safety nets. Certainly, Mrs. Gotham did not adjust her spending on luxury goods or her ability to recognize financial priorities as quickly as she should have. She explained that she had hoped that the assistance of family and friends would stave off the inevitable. For a period of time, that aid was forthcoming. Therefore, although the events leading up to the bankruptcy were not entirely unforseen, they were unanticipated and quick.

## IV. *Conclusion*

An application of the facts to the forgoing factors does not result in clear victory for either side. When viewed in their totality, however, the facts support that the Debtors do not have the income to pay their creditors and did not set out to deceive them or the Court when they filed. When faced with financial adversity, the Debtors did not make prudent decisions. Those choices, however, do not reflect that granting them a discharge would result in a substantial abuse of the Bankruptcy Code. Moreover § 707(b) also specifies that there is a presumption in favor of granting relief to debtors. Based upon the forgoing, I cannot conclude that the Trustee has overcome that presumption. As a result, I will enter an order denying the Motion.